*In re* PATERNITY OF JESSICA SUSAN FLYNN

*In re* CUSTODY OF JESSICA SUSAN FLYNN

FLYNN v FLYNN

Docket Nos. 66712, 66896, 70113. Submitted June 27, 1983, at Detroit.
—Decided December 5, 1983.

> Jessica Susan Flynn was born on October 7, 1977. Jessica's mother, Susan J. Flynn, at the time of Jessica's conception and birth was married to David E. Flynn, was sexually intimate with her then husband, and was also sexually intimate with Alan Castle. Susan filed for a divorce in Oakland Circuit Court. Temporary custody of Jessica was originally given to David, however, thereafter, David was granted four days of custody and visitation per week and Susan was granted custody and visitation for three days a week. Shortly thereafter Susan took Jessica and moved to Illinois for three months and then moved with Jessica to Toledo, Ohio, where she and Jessica lived with Alan who commuted to his employment in Detroit. During this time David filed a counterclaim for divorce, was granted a divorce and was awarded permanent custody of Jessica. Alan,

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 73 Am Jur 2d, Statutes § 145.

[3, 4] 10 Am Jur 2d, Bastards §§ 46, 75.

[4] 10 Am Jur 2d, Bastards § 1.

[5, 7] 10 Am Jur 2d, Bastards § 64.

[5, 7-9, 13, 15] 59 Am Jur 2d, Parent and Child § 32.

[6] 5 Am Jur 2d, Appeal and Error §§ 703, 704.

[7, 9] 76 Am Jur 2d, Trial §§ 1253, 1254.

[8] 59 Am Jur 2d, Parent and Child §§ 41, 43.
  Desire of child as to geographical location of residence or domicil as factor in awarding custody or terminating parental rights. 10 ALR4th 827.

[10] 59 Am Jur 2d, Parent and Child § 27.

[11] 59 Am Jur 2d, Parent and Child § 2.

[12] 10 Am Jur 2d, Bastards § 118.

[14, 15] 10 Am Jur 2d, Bastards § 62.5.
  59 Am Jur 2d, Parent and Child § 45.
  Right of putative father to visit illegitimate child. 15 ALR3d 887.

[16] 10 Am Jur 2d, Bastards §§ 75, 85.

Susan and Jessica, living under assumed names, moved to and lived in the Detroit area until April, 1982, when David became aware of Jessica's whereabouts and obtained physical custody of the child. Alan and Susan married. Susan filed a petition in Oakland Circuit Court seeking that custody of Jessica be changed to her. Alan filed a paternity action in Oakland Circuit Court asserting that he was the biological father of Jessica and, at the same time, joined Susan in the petition seeking the change of custody.

Human leukocyte antigen (HLA) blood tests were taken pursuant to a court order in the paternity action. David moved for accelerated judgment in the paternity action on the basis that Alan did not have jurisdictional standing to bring the paternity action since the support of Jessica was not at issue. Francis X. O'Brien, J., granted the motion for accelerated judgment and dismissed the paternity action. The HLA results were sealed by order of the court and were transferred to the custody action.

Following extensive evidentiary hearings, Judge O'Brien found that it was in the best interests of Jessica that she remain in the custody of David. While Judge O'Brien acknowledged and apparently considered each of the "best interest" factors contained in the Child Custody Act, he did not make specific findings of fact with respect to each of those factors.

After the trial court's decision but before entry of the order in the child custody action, Susan filed a motion for modification of the order providing for visitation, requesting that she have visitation rights during the times that David was at work. The parties stipulated that no evidentiary hearing would be held but rather that the court would decide the question on the basis of the report of the friend of the court and letters from Susan's psychologist and Jessica's day-care provider. Judge O'Brien denied the motion for modification of the visitation provisions.

Alan appeals by leave granted the order dismissing the paternity action (Docket No. 66896). Alan and Susan appeal from the denial of the petition for a change of custody (Docket No. 66712). Susan appeals from the denial of the petition to modify the visitation provisions (Docket No. 70113). The appeals were consolidated for consideration. *Held:*

1. The stated legislative purpose of the Paternity Act is to provide for the support of children born out of wedlock. Since the paternity action brought by Alan Castle did not involve the question of the support of the child, the trial court properly

granted accelerated judgment and dismissed the paternity action.

2. While the trial court acknowledged and apparently considered each of the eleven listed factors to be considered in determining the best interests of the child in a proceeding under the Child Custody Act, the trial court's failure to make specific findings of fact as to each of those factors prevents the Court of Appeals from undertaking a meaningful review of the trial court's determination. In view of the general failure of the trial court to make specific findings of fact and the specific failure to fully address the question of the child's established custodial environment, it is necessary to remand to the trial court for specific findings of fact and for reconsideration and redetermination of the question of the best interests of the child.

3. Since the Child Custody Act creates a presumption in favor of a child's parents in a custody dispute involving a nonparent, and a parent for the purpose of that presumption has been held to mean the natural parent, the question of whether Jessica was fathered by David Flynn or Alan Castle was a relevant consideration. Accordingly, the results of the HLA blood tests are relevant evidence and should have been admitted into evidence unless inadmissible on some other ground.

4. The trial court properly held that the testimony of the mother concerning statements made by the child was inadmissible hearsay.

5. The trial court properly considered Susan Flynn's past attitude toward and willingness to abide by the court's orders in determining the best interests of the child in the custody proceeding. The court did not give undue emphasis to that factor.

6. While the provisions of the Child Custody Act apply to a visitation dispute, a trial court need only address those factors relating to the best interests of the child which are specifically contested in the visitation dispute. Since none of those factors was specifically raised in the motion for change of visitation, reversal is not mandated by the failure of the trial court to make specific findings of fact as to the statutory factors.

The judgment in the paternity action and order in the visitation dispute proceeding are affirmed; the order dismissing the change of custody is reversed and that matter is remanded for further proceedings.

Hood, J., concurred in the disposition of the appeals of the

custody and visitation orders but dissented from the affirmance of the dismissal of the paternity action. He would hold that an action lies under the Paternity Act to determine filiation even where there is no question relating to the support of the child. He would reverse the order granting accelerated judgment in the paternity action and would remand for a hearing on the question of whether Alan Castle was the biological father of Jessica Flynn.

## OPINION OF THE COURT

1. STATUTES — JUDICIAL CONSTRUCTION.

Statutes are to be construed as they were intended to be understood when they were passed.

2. STATUTES — JUDICIAL CONSTRUCTION.

Courts have a duty to enforce statutory provisions as written.

3. CHILDREN BORN OUT OF WEDLOCK — PATERNITY ACT.

The purpose of the Paternity Act is to provide support for children born out of wedlock.

4. CHILDREN BORN OUT OF WEDLOCK — PATERNITY ACT — MARRIAGE — SUPPORT OF CHILDREN.

An action may be brought under the Paternity Act even where the child is born during a marriage, if it is determined that the child is not the issue of that marriage; however, an action under the Paternity Act only may be brought where the purpose of the action is to provide for the support of the child (MCL 722.711 *et seq.;* MSA 25.491 *et seq.).*

5. PARENT AND CHILD — CHILD CUSTODY ACT — COURTS — FINDINGS OF FACT.

A trial court, in determining the best interests of a child in a custody dispute, must evaluate each of the factors relating to the best interests of the child contained in the Child Custody Act and must make a definitive finding of fact and conclusion of law as to each of the factors (MCL 722.23; MSA 25.312[3]; GCR 1963, 517.1).

6. PARENT AND CHILD — CHILD CUSTODY ACT — APPEAL.

Review of child custody cases by the Court of Appeals is *de novo;* however, to ensure stability and finality in the resolution of child custody matters, all orders and judgments of the trial court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of the evidence or

committed a palpable abuse of discretion or a clear legal error on a major issue (MCL 722.28; MSA 25.312[8]).

7. Parent and Child — Child Custody Act — Courts — Findings of Fact — Appeal.

A trial court in a child custody dispute need not comment on each matter in dispute; however, the trial court must make a specific finding of fact as to each of the "best interests of the child" criteria in the Child Custody Act, since without such findings the Court of Appeals is unable to undertake the type of appellate review mandated by the Child Custody Act (MCL 722.23, 722.28; MSA 25.312[3], 25.312[8]).

8. Parent and Child — Child Custody Act — Established Custodial Environment — Courts — Change of Custody.

A trial court, in determining the established custodial environment in a child custody dispute, may not presume an established custodial environment from the fact of the existence of a prior custody order but must rather look to the actual circumstances of each case, guided by the standardized criteria; once the established custodial environment is determined, clear and convincing evidence is required to change or modify the existing custody arrangement (MCL 722.27[c]; MSA 25.312[7][c]).

9. Parent and Child — Established Custodial Environment — Courts — Findings of Fact — Appeal.

The failure of a trial court in a child custody dispute to make sufficient specific findings of fact relative to the established custodial environment of the child mandates remand to the trial court for further findings of fact by the trial court on that question.

10. Parent and Child — Child Custody Act — Presumptions — Evidence.

The Child Custody Act creates a presumption in favor of the parents in custody disputes involving third parties; a nonparent may prevail only by presenting clear and convincing evidence that it would be in the best interests of the child for custody to be in other than the parents (MCL 722.25; MSA 25.312[5]).

11. Words and Phrases — Parent — Child Custody Act.

The term "parent" is not defined in the Child Custody Act, however, that term, as used in the parental presumption provision of the Child Custody Act, has been held to mean "natural parent" (MCL 722.25; MSA 25.312[5]).

12. PARENT AND CHILD — CHILD CUSTODY ACT — EVIDENCE — PATERNITY — BLOOD TEST EVIDENCE.

Paternity is a fact of consequence in any child custody proceeding; accordingly, since paternity is relevant evidence in a child custody proceeding, human leukocyte antigen blood test evidence is relevant evidence in such a proceeding and is admissible unless subject to objection on some evidentiary ground other than relevancy (MRE 401, 402).

13. PARENT AND CHILD — CHILD CUSTODY.

A trial court in a child custody dispute may consider a parent's past attitude toward and willingness to abide by the court's orders in determining the best interests of the child.

14. PARENT AND CHILD — CHILD CUSTODY ACT — VISITATION RIGHTS.

The Child Custody Act is intended to govern questions of visitation rights as well as child custody dipsutes (MCL 722.21 *et seq.;* MSA 25.312[1] *et seq.).*

15. PARENT AND CHILD — VISITATION RIGHTS — CONTESTED ISSUES.

A trial court in a dispute involving visitation rights need not evaluate each of the factors contained in the Child Custody Act for determination of the best interests of the child in regard to custody; in disputes concerning visitation rights, the trial court may address only those "best interests" factors which are specifically contested.

PARTIAL CONCURRENCE BY HOOD, J.

16. CHILDREN BORN OUT OF WEDLOCK — PATERNITY ACT — JURISDICTION.

*A person who asserts that he is the father of a child and who seeks an order of filiation has jurisdictional standing to bring an action under the Paternity Act to determine his paternity notwithstanding the fact that support of the child is not at issue.*

*Hyman, Gurwin, Nachman, Friedman & Winkleman* (by *Hanley M. Gurwin* and *Scott Bassett),* for Alan and Susan Castle.

*Burce T. Leitman,* for David E. Flynn.

Before: Cynar, P.J., and Hood and R. J. Jason,*
JJ.

Cynar, P.J., In *In re Paternity of Jessica Susan
Flynn,* Court of Appeals Docket No. 66896 (herein-
after the paternity action), plaintiff Alan Castle
(Alan) appeals following a grant of application for
leave to appeal the July 16, 1982, dismissal of his
paternity petition based upon the June 9, 1982,
grant of accelerated judgment to defendant David
E. Flynn (David or defendant). In *In re Custody of
Jessica Susan Flynn,* Court of Appeals Docket No.
66712 (hereinafter the custody proceeding), plain-
tiff Susan Flynn-Castle (Susan) and Alan appeal as
of right the September 1, 1982, orders denying
their motions for change of custody. (Susan and
Alan are also referred to as plaintiffs.) In *Susan J
Flynn v David E Flynn,* Court of Appeals Docket
No. 70113 (hereinafter the visitation proceeding),
Susan appeals from the March 10, 1983, order
denying her request for modification of the order
relative to her visitation rights. By order of this
Court the three cases were consolidated for consid-
eration on appeal.

Susan and David were married on March 10,
1973. In 1975, they met Alan when they enrolled
in an adult education psychology course taught by
Alan. Sometime in 1976, Alan and Susan became
sexually intimate. Susan continued to live with
David and continued to have sexual relations with
him. Susan became pregnant and on October 7,
1977, gave birth to Jessica Susan. In April of 1978,
after his divorce became final, Alan moved in with
the Flynn family. In August, 1978, Susan asked
David for a divorce and informed him of her
relationship with Alan. David remained in the

* Circuit judge, sitting on the Court of Appeals by assignment.

home until approximately October 1, 1978, when he moved into the duplex where he currently resides. Susan, Alan, and Jessica remained together. The parties arranged for informal visitation and David visited Jessica and on occasion took her overnight. Following a long Thanksgiving weekend, David refused to return Jessica to Susan's custody. Divorce proceedings were instituted and David was granted temporary custody of Jessica. In her complaint for divorce, Susan stated that while she and David cohabited and lived together as husband and wife, Jessica Susan Flynn was born unto them. In February, 1979, temporary custody of Jessica was placed in the court and David was granted four days of visitation and custody, and Susan three days. The court ordered the parties to submit to a psychological evaluation.

On April 6, 1979, Susan and Jessica left Michigan and took up residence in Bloomington, Illinois. In July, 1979, Susan and Jessica moved to Toledo, Ohio. Alan resided with them in Toledo. On July 11, 1979, David filed a counterclaim for divorce, alleging that, during the marriage, Jessica was born of the parties. The answer admitted this allegation. In November, 1979, David was granted a divorce and permanent custody of Jessica Susan Flynn, the minor child of the parties. In March, 1980, Alan, Susan, and Jessica moved to Detroit, and in September, 1981, moved to their current home in Warren, Michigan. During this time period Susan and Alan adopted the names "Jan" and "James Drewy". David became aware of Jessica's whereabouts and on April 1, 1982, obtained physical custody of the child.

On April 12, 1982, Susan and Alan married. Susan then commenced the custody proceeding by filing a petition for a change of custody. Alan

commenced the paternity action by filing a complaint under the Paternity Act, seeking to be declared the biological father of Jessica. At the same time, he joined in a petition seeking custody in the custody proceeding which had been commenced by Susan. Human leukocyte antigen (HLA) blood tests were taken, pursuant to a court order in the paternity action, in June, 1982. After dismissal of the paternity action, the HLA order was transferred to the custody proceeding and the results were ordered sealed pending further court order.

Hearings were conducted on Susan and Alan's custody motions on June 9, July 16, 20, 22, August 17, 19, 20, 23, and 24, 1982. The parties stipulated that, at the time of the hearings, David had legal and physical custody of Jessica pursuant to the order in the 1979 divorce decree. It was also stipulated that, at the time of Jessica's conception, both David and Alan had sexual access to Susan.

Alan's testimony may be summarized as follows. He believed Jessica was his daughter based on her physical characteristics and resemblence to his other children. He claimed to have totally supported Jessica almost from her birth. In April of 1979, he thought Jessica was in an unhealthy and unstable situation because of the four-day/three-day custody arrangement. Although the decision to move to Illinois in April, 1979, was Susan's decision, Alan gave her money and asked his niece to help arrange accommodations, and his son provided transportation. Alan visited them almost every weekend. It was a joint decision to move to Toledo. He lived there and commuted to work in Detroit. They used the name Drewy to avoid anyone's finding out where Susan lived. He indicated that he would not exercise self-help remedies in

the future and would comply with any court orders on custody and visitation. On cross-examination, Alan testified that he was married in 1958 to Barbara Castle and was divorced from her in 1978. During that time he had a sexual relationship with Mary Lou Bell from 1966 to 1981. His sexual relationship with Susan began in 1976. In retrospect, he felt that his simultaneous sexual relationships with the three women was morally wrong. He utilized the name Drewy to obtain telephone service in Toledo, Detroit, and Warren. He paid all the expenses for Susan and Jessica in those cities. In response to questioning by the trial court, Alan indicated that, although it crossed his mind that Jessica was his child, it was a confusing time for him and he did not file the paternity action until after his marriage to Susan. Alan had no reason to believe that David was an unfit custodial parent. He believed, however, that Jessica needed a stable environment and that he and Susan were better able to provide that than David.

Susan's testimony may be summarized as follows. She left with Jessica in April, 1979, because she did not believe that having four extra caretakers (due to David's working schedule) was good for Jessica. David's sisters cared for Jessica when he was at work. She did not tell Jessica who her father was during the period from 1979 to 1982. She believed that Alan rather than David should have custody because of the relationship developed over the past three years, Alan's willingness and ability to provide Jessica with an education, and Alan's capability to better contribute to Jessica's growth. She indicated that she would not leave the jurisdiction again because circumstances had changed since 1979. On cross-examination, Susan testified that she adopted the name Drewy to

protect herself and her child from being found. She did not believe that her past actions impacted upon her moral fitness.

David testified that in his efforts to locate Susan and Jessica he contacted the FBI, Child Find, and attempted to follow Alan and that, for the first 1-1/2 years of Jessica's life, Susan cared for Jessica during the day and they shared this responsibility after he returned from work. He had developed a strong emotional bond to Jessica during that time. He further testified that he would provide a stable home, without deceit, for Jessica and that the results of the HLA tests would not make any difference in his attitude.

Lorraine Ousthous, a friend of the court worker, testified as follows concerning her recommendation that David retain custody of Jessica. Utilizing the Child Custody Act factors as a guide, she testified that Jessica had an emotional bond to all three individuals but that Alan's interaction with the child was minimal. As to the capacity and disposition of the parties to give the child love, affection and guidance, although she noted some weakenss in the parenting skills of Susan and David, both had the same abilities. Jessica did not view Alan as a significant factor in her life. Alan and David were equal in their capacity to provide material and financial support for Jessica, while Susan was dependent on Alan for her support. It was her opinion that Jessica was not in a stable environment when in the care of Susan and Alan. This was based upon the numerous moves during the three-year period. Jessica did receive continuous care from Susan, but Jessica's physical and social surroundings were interrupted. David had provided a stable environment from the time he obtained custody in April, 1982. On the perma-

nency of the proposed custodial homes, Ousthous indicated that David's home was more permanent. In her opinion, David was morally fit, while Alan and Susan were not. The physical health of all the parties was good. David had demonstrated mental stability in his past actions and behaviors and, in her opinion, Alan and Susan had not. As to Jessica's established custodial environment, Ousthous testified that Jessica adjusted well to David's home environment and had been adjusted while in Alan and Susan's care. The child did have some difficulties with socialization in her day-care and nursery school environment. In her opinion, contributing factors to Jessica's socialization problems were the numerous relocations, the secrecy maintained concerning her whereabouts, and the use of an alias. David was willing to encourage a relationship between Susan and Jessica but was ambivalent about a continued relationship with Alan. Susan did not demonstrate a willingness to assist David in maintaining a relationship with Jessica. Ousthous expressed no opinion as to the preferences of the child and did not consider any other factors in her recommendation. Ousthous indicated that, inasmuch as she had no means of determining which man was the biological father, she wrote her report on the basis of who was more fit to have custody of the child.

Dr. George Barahol conducted the court-ordered evaluation of the parties in 1979. At that time, it was his opinion that Susan tended to be superficial and naive and that Alan was manipulative and not realistic about the impact of the affair upon the Flynn marriage and Jessica. His later evaluation of Jessica in May, 1982, revealed that she was a "brilliant" child. Based on his observations of Jessica and David in 1972, Barahol had no reserva-

tions that David would be an excellent father. Barahol testified that the HLA test results would not affect his recommendation because biological paternity was not controlling in determining the best interests of the child. Although he acknowledged that at some point Jessica should be told the identity of her biological father, he did not feel that Jessica should be told until after the hostility and confrontations between the parties, and the custody dispute, had been resolved.

At the conclusion of the testimony and after hearing oral arguments, the trial court denied Susan and Alan's petitions for custody. It did not allow the results of the HLA tests into evidence and did not determine paternity.

In January, 1983, Susan filed a motion for increased visitation, specifically requesting visitation during the time that Jessica was in day care. The parties stipulated that no evidentiary hearing would be held and that the trial court could review the friend of the court report and other documents submitted by the parties. After hearing oral arguments, the trial court took the matter under review. By written order dated March 10, 1983, the trial court denied Susan's request for visitation in lieu of day care.

We first consider whether the trial court erred by dismissing the paternity action brought by Alan.

Alan filed a complaint requesting that he be found to be the father of Jessica under the Paternity Act, MCL 722.711 *et seq.;* MSA 25.491 *et seq.* Prior to its 1980 amendment, MCL 722.711(a); MSA 25.491(a) provided:

"A child born out of wedlock is a child begotten and

born to any woman who was unmarried from the conception to the date of birth of the child."

David moved for accelerated judgment. The court, relying on *Winsett v Donaldson,* 69 Mich App 36; 244 NW2d 355 (1976), determined that Alan lacked standing to bring this action, since the child was not born to an unmarried but to a married woman. However we are persuaded by the holding in *Winsett* that a forum is available under the Child Custody Act to determine the lineage of a child when the mother was married to another man.

In *Smith v Robbins,* 91 Mich App 284; 283 NW2d 725 (1979), *lv den* 408 Mich 853 (1980), the plaintiff, a married woman, filed a complaint seeking an order of filiation, alleging the defendant to be the father of her child. Defendant filed a motion for summary judgment, alleging that the plaintiff had not stated a claim upon which relief could be granted because the child was born and conceived while plaintiff was married.

The *Smith* Court noted that the purpose of the Paternity Act is to provide for the support of an illegitimate child. In examining extrajurisdictional cases attempting to define the phrase "out of wedlock", the *Smith* panel concluded: "The main objective sought to be accomplished by use of these various interpretations is to uphold legislation that mandates a child be supported by the biological father." *Smith, supra,* pp 290-291. The Court, in adopting a prior interpretation by Judge V. J. BRENNAN, held that the Paternity Act operates where the mother of the child is not lawfully married to the father of the child.

Shortly after the decision in *Smith, supra,* the

Legislature amended 1980 PA 54, § 1, MCL 722.711(a); MSA 25.491, to read as follows:

" 'Child born out of wedlock' means a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or a child which the court has determined to be a child born during a marriage but not the issue of that marriage."

The amended legislation provides that an action may be brought under the Paternity Act for support whether the child was born to an unmarried or married woman.

The preamble to the Paternity Act, MCL 722.711 *et seq.;* MSA 25.491 *et seq.,* provides:

"An Act to confer upon circuit courts jurisdiction over proceedings to compel and provide support of children born out of wedlock; to prescribe the procedure for determination of such liability; to authorize agreements providing for furnishing of such support and to provide for the enforcement thereof; and to prescribe penalties for the violation of certain provisions of this act."

Statutes are to be construed as they were intended to be understood when they were passed. *Wayne County Board of Comm'rs v Wayne County Clerk,* 293 Mich 229; 291 NW 879 (1940). Courts have a duty to enforce statutes as written. *Scholten v Rhoades,* 67 Mich App 736, 745; 242 NW2d 509 (1976). The purpose of the Paternity Act is to provide for support for children born out of wedlock. *Van Laar v Rozema,* 94 Mich App 619; 288 NW2d 667 (1980); *Tuer v Niedoliwka,* 92 Mich App 694; 285 NW2d 424 (1979); *Smith v Robbins,* 91 Mich App 284; 283 NW2d 725 (1979), *lv den* 408 Mich 853 (1980).

The Michigan Supreme Court observed in *Mc-*

*Kellar v Detroit,* 57 Mich 158, 159; 23 NW 621 (1885): "Under our constitution the title of [a public] act is significant, and usually controlling, in determining its scope * * *." The question of compelling or providing support of a child born out of wedlock is not involved in this case. The trial court did not err in dismissing the paternity action. We proceed therefore to a discussion of issues raised in the appeal from the order denying the petition for a change of custody of the child.

First, we find that the trial court failed to make adequate findings of fact when resolving the custody issue.

In deciding a custody matter, a trial court must evaluate each of the factors contained in the Child Custody Act, MCL 722.23; MSA 25.312(3), and must state a conclusion on each, thereby determining the best interests of the child. *Speers v Speers,* 108 Mich App 543; 310 NW2d 455 (1981). When considering the "best interests" factors, the trial court is further required by GCR 1963, 517.1 to make definite findings of fact and to state its conclusions of law. The findings of the trial court are set forth as follows:

"*The Court:* The court having considered the evidence presented during this protracted post-judgment hearing on the two separate motions—one by Mr. Allen *[sic]* Castle and other by Mrs. Flynn-Castle—for custody of Jessica, the four and a half year old girl child of Mrs. Flynn.

"The judgment of divorce entered on July 31st, 1980 *[sic]* which followed the contested trial, awarded custody of Jessica to the then husband, David Flynn.

"The court has observed the demeanor of the witnesses and assigned credibility to their testimony presented during this hearing, and having been personally familiar with this case since its inception due to my personal handling of all pre- and post-trial matters, and

being otherwise advised on the complex and somewhat new principles of law, finds as follows:

"So, therefore, on Mr. Castle's motion, the court having considered all of the factors in the Child Custody Act finds that regardless of the paternity issue there has been clear and convincing proof that factors A, B, and C regarding only the disposition to provide the specific care and needs, and factors D, E, and F, unquestionably support this court's finding and order that the best interests of Jessica shall be served by continuing custody with David Flynn. And Mr. Castle's motion is hereby denied.

"Regarding Mrs. Flynn-Castle's motion, it is not that simple. The court again considered the issue in light of the Child Custody Act and finds factors A, B, and C, regarding disposition, and also C regarding capacity, so long as there is a willingness by Mr. Castle to contribute, and/or Mr. Flynn is compelled to contribute, and factors G and I—they are equal.

"However, the proofs have established by clear and convincing evidence that based upon Mrs. Flynn-Castle's past attitude and conduct, her expressions and demeanor in these proceedings, that factors D, E, F, and J support this court's findings and order that the best interests of Jessica shall be served by continued custody with David Flynn.

"The court further finds that neither party has sustained the burden of factor H. And finally as to K, which is designated—the other factors considered relevant to this child dispute—Mrs. Flynn-Castle's emotional conflict over her personal value regarding obedience to court orders, her child's best interest, and her desire to be with Mr. Castle, have in a small degree influenced the court to rule accordingly even though I find her behavior not malicious or intentionally disrespectful or selfish of the needs of other individuals.

"Have an order prepared in accordance with this order, ruling and finding, and I would indicate that order shall continue until further order of the court. This does not preclude the possibility of modification in time."

Child custody cases are considered *de novo* by this Court, and evidence is examined apart from the trial judge's findings of fact. *DeGrow v De-Grow,* 112 Mich App 260; 315 NW2d 915 (1982). Review is limited, however, by MCL 722.28; MSA 25.312(8), which states:

"To expedite the resolution of a child custody dispute by prompt and final adjudication, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of the evidence or committed a palpable abuse of discretion or a clear legal error on a major issue."

Such a standard of review is only meaningful if the trial court fulfills its fact-finding duty. Pursuant to the Child Custody Act, the trial judge is required to "consider, evaluate and determine" each of the 11 factors individually. *Lustig v Lustig,* 99 Mich App 716; 299 NW2d 375 (1980).

The trial court did acknowledge, and apparently considered, all 11 factors as they related to the petition for custody. Special deference is given to the ability of the trial court to observe the demeanor and assess the credibility of the witnesses. Testimony brought forth evidence on the qualifications of the respective parties as custodial parents. The testimony was lengthy and at times in conflict. While the trial court need not comment upon every matter in dispute, the record is lacking in judicial fact-finding on the "best interest" criteria. Without factual findings, this Court is unable to follow the explicit standard of appellate review established in the Child Custody Act. Various remedies are available where the trial court fails to make sufficient factual findings on the "best interest" factors. *Lewis v Lewis,* 73 Mich App 563; 252 NW2d 237 (1977).

We find that the trial court erred in failing to determine whether an established custodial environment existed.

MCL 722.27(c); MSA 25.312(7)(c) provides in pertinent part:

"The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment and the inclination of the custodian and the child as to permanency of the relationship shall also be considered."

A trial court may not presume an established custodial environment from the existence of a prior court order granting custody, but rather, must look to the actual circumstances of each case, guided by standardized criteria. *Wealton v Wealton,* 120 Mich App 406; 327 NW2d 493 (1982). Once established, clear and convincing evidence is required to change or modify the existing custody arrangement.

The trial judge made no mention of an established custodial environment in his oral findings or written order.

The trial judge weighed factors (d) and (e) in favor of David. Those criteria are relevant to the existence of an established custodial environment and deal with the stability of the environment and the permanency of the custodial home. No explicit findings were made on either factor. Without any specific factual findings, we are not able to determine whether the trial court found that no custo-

dial environment had been established at all, that David had established such an environment, or that Susan had not established such an environment. Further, it is not clear whether the single reference to "clear and convincing evidence" applies to the custodial environment or the parental custody presumption. We are not persuaded that the mere mention of the term "clear and convincing evidence" resolved the issue of the established custodial environment. The trial judge should have resolved this issue and stated his findings on the record.

The trial court made insufficient factual findings in awarding custody and failed to determine whether there was an established custodial environment with either David or Susan. Failure to do so requires remand for fact-finding and determination. Although it is sometimes necessary to hold a new child custody hearing on remand where the trial court's original findings of fact were insufficient for review purposes, such a remedy is not appropriate under the circumstances of this case. *Cf., Lewis, supra,* p 567.

We find that the trial court erred in failing to allow into evidence the results of the HLA blood tests, unless that evidence is found to be inadmissible on some ground other than relevancy.

Section 5 of the Child Custody Act, MCL 722.25; MSA 25.312(5), creates a presumption in favor of parents versus third parties in custody disputes. A nonparent may prevail only by presenting "clear and convincing" evidence that it would be in the child's best interest to be removed from the parents' custody. The term "parent" is not defined in the act itself. Several cases involving that presumption have used the term "natural parent" when resolving the issue. *Deel v Deel,* 113 Mich

App 556; 317 NW2d 685 (1982); *Bahr v Bahr,* 60 Mich App 354; 230 NW2d 430 (1975), *lv den* 394 Mich 794 (1975).

In the present case Susan is the natural mother. Birth of the child during wedlock creates a pre- sumption that David is the natural father. While it may be assumed that biological parentage alone does not insure that awarding custody to that person would always be in the best interest of the child, the Legislature has established a strong presumption favoring parental custody. Although the trial court's opinion indicates that "regardless of the paternity issue" there was clear and con- vincing evidence that custody should be awarded to David as opposed to Alan, it is unclear what weight, if any, was accorded the statutory pre- sumption. We are not able to understand how a presumption may be given effect without knowing where the presumption lies. Without factual find- ings it is impossible to determine whether any error occurred.

HLA blood testing is one of the most recent scientific advancements available to the courts in making paternity determinations. Unlike the stan- dard ABO blood grouping test, which was rarely more than 60% accurate when used to prove paternity, the HLA test is usually more than 90% accurate. Teraski, *Resolution by HLA Testing of 1,000 Paternity Cases Not Excluded by ABO Test- ing,* 16 J Fam L 543 (1978). Often a figure of 95 to 98 percent accuracy is quoted in support of HLA testing in the context of proving paternity.

MCL 722.716; MSA 25.496, as amended, allows HLA blood test results to be admitted in paternity actions as affirmative evidence of paternity. In *Raleigh v Watkins,* 97 Mich App 258; 293 NW2d 789 (1980), a putative biological father was held to

have standing to seek visitation rights under the Child Custody Act. Among the evidence offered by the putative father and admitted by the court were the results of blood tests tending to prove his paternity. In *Shepherd v Shepherd,* 81 Mich App 465; 265 NW2d 374 (1978), the husband in a divorce action denied paternity of a child born during the marriage. He then petitioned the trial court for blood tests in an effort to prove his nonpaternity. The trial court denied his request. This Court declared that the husband was entitled to blood tests enabling him to present his best evidence on nonpaternity to overcome the presumption of legitimacy.

In creating the parental presumption of MCL 722.25; MSA 25.312(5), the Legislature determined that paternity is a "fact of consequence" in any child custody proceeding. MRE 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Because blood test evidence may prove or disprove a "fact of consequence", it is "relevant evidence" pursuant to MRE 401. Since blood test evidence is relevant, it is admissible. MRE 402. On remand, the trial court shall receive the HLA blood tests into evidence to be considered under the applicable criteria, provided some evidentiary issue other than relevancy is not involved. Should an evidentiary foundation be necessary, plaintiffs shall be afforded an opportunity to submit further proofs in this regard.

During direct examination of Susan, the plaintiffs' attorney sought to elicit testimony concerning

conversations and questions asked by Jessica concerning David's identity and why she was living with him. The trial court sustained defendant's objection and refused to allow the testimony. The trial court properly held that such testimony was inadmissible hearsay. *Williamson v Williamson*, 122 Mich App 667; 333 NW2d 6 (1982).

In denying Susan's petition for a change of custody, the trial judge referred to her "past attitude and conduct" and "her personal value regarding obedience to court orders". He considered those actions under subsection (k) of § 3 of the Child Custody Act. Susan's past conduct was an appropriate and relevant factor to be considered. She argues that the trial judge placed undue emphasis on her prior conduct. Susan's past attitude toward and willingness to abide by court orders were relevant criteria to be considered as factors relating to the best interests of Jessica. There was no error in considering this nor was undue emphasis given to this factor.

In her appeal from the order in the visitation dispute, Susan asserts that the trial court erred in its denial of her motion for increase in visitation. Susan contends that the trial court failed to make reviewable findings of fact and conclusions of law and that the trial court's decision was against the great weight of the evidence. We disagree.

David has custody of Jessica pursuant to a divorce judgment signed by the trial judge on November 15, 1979. An order signed on November 1, 1983, granted visitation rights to Susan. That order was reviewable in 90 days upon petition by either party. On Janury 5, 1983, Susan filed a motion for increased visitation rights. The parties agreed on certain portions of that request. Susan also requested visitation during the times that

Jessica was placed in day care while David was at work. Susan requested that she have visitation weekdays from noon to 4 p.m. and in the summer during the time David was at work. The parties stipulated that no evidentiary hearing would be held and agreed that the trial court could decide the issue based upon the friend of the court report, two letters submitted by Susan's psychologist, and a letter submitted by the day-care provider. The trial judge's order of March 10, 1983, denied Susan's request for visitation in lieu of day care.

Although the Child Custody Act applies specifically to custody disputes, this Court has held that it also applies to visitation disputes. *Irish v Irish,* 102 Mich App 75; 300 NW2d 739 (1980). The "best interest" factors are applicable in visitation disputes, but the fact-finding requirement has been relaxed to provide that the trial judge need only focus on contested issues. *Hoffman v Hoffman,* 119 Mich App 79; 326 NW2d 136 (1982). There is no indication in the lower court record that Susan specified which of the "best interest" factors were disputed and therefore at issue. Nor does the documentary evidence presented to the trial court for consideration set forth any specific contested factors. No specific factual findings were made by the trial judge. On appeal, Susan argues that factors (a), (b), (e), (i), and (j) were relevant and should have been decided by the trial judge. David argues that there was no factual dispute and therefore the trial judge was not required to make specific factual findings.

Absent specific factual findings on contested child custody factors, this Court is not able to conduct a meaningful review. However, based on the stipulated record, we do not find error in the trial court's denial of increased visitation. It is not

apparent that any of the enumerated best interest factors were in dispute in the trial court. The crux of Susan's petition was a request for visitation during the time David's employment required him to place Jessica in day care. Although denominated as a visitation petition, the ultimate effect of this modification would border on a joint custody arrangement. Granting Susan's request would have added greater confusion and instability to the life of this young child. Jessica would be shuttled between the households on a daily basis. As custodial parent, David has the obligation and responsibility to make choices for the care of the child. We do not find that the trial court was in error in denying Susan visitation with the minor child during those times when defendant's employment hours require him to place the child in a day care home.

The order and judgment in the paternity action (Docket No. 66896) and the order in the visitation dispute (Docket No. 70113) are affirmed. The order in the custody dispute (Docket No. 66712) is reversed and the matter is remanded for complete and definite findings of fact in accordance with this opinion and for a determination thereon. We do not retain jurisdiction.

R. J. JASON, J., concurred.

HOOD, J. *(dissenting in part and concurring in part).* I agree and concur with the majority opinion's disposition of the appeal in the custody dispute (Docket No. 66712) and the appeal in the visitation dispute (Docket No. 70133). However, I must respectfully dissent from the majority's affirmance of the accelerated judgment in the paternity action (Docket No. 66896).

Subject matter jurisdiction is an appropriate

ground on which to raise a motion for accelerated judgment. GCR 1963, 116.1(2); *Baker v Detroit,* 73 Mich App 67, 71; 250 NW2d 543 (1976). However, the Paternity Act confers jurisdiction on the circuit courts for any action brought by a putative biological father seeking an order of filiation. MCL 722.714; MSA 25.494. That jurisdictional proviso uses mandatory language. Once a putative father files a paternity action seeking filiation in the proper circuit court, that court must conduct a hearing on the matter and enter an order of filiation if the child is the biological issue of the petitioner and a child born out of wedlock.

When Alan Castle petitioned for the order of filiation in April, 1982, the Legislature had amended the Paternity Act to include as a child born out of wedlock a child born during a marriage but not the issue of that marriage. MCL 722.711; MSA 25.491. Thus, under the clear and unambigious language of the act, Alan Castle did have standing to bring this paternity action and the circuit court did have subject matter jurisdiction. Moreover, a court hearing a motion for accelerated judgment must construe the plaintiff's well-pleaded facts favorably toward plaintiff. *St Paul Fire & Marine Ins Co v Guardian Alarm Co of Michigan,* 115 Mich App 278, 281; 320 NW2d 244 (1982). Alan Castle did plead that he was the biological father of Jessica Flynn. Therefore, I can find no basis for the trial court's grant of accelerated judgment based upon lack of subject matter jurisdiction.

Finally, although I agree with the majority opinion's finding that the primary purpose of the Paternity Act is to provide support for illegitimate children, *Van Laar v Rozema,* 94 Mich App 619, 622; 288 NW2d 667 (1980), the act certainly cannot

be construed to preclude Alan Castle's petition merely because David Flynn does currently provide support to Jessica Flynn and is willing to continue to do so. The act is concerned with determining the *biological* father's duty to support. If Alan Castle declares himself to be that biological father, seeks a court determination of that fact, and is willing to accept support obligations thereto, his petition under the Paternity Act is appropriate.

Therefore, I would reverse the accelerated judgment granted in the paternity action, and would remand that case to the circuit court with an order to hold a hearing at which all relevant admissible evidence (including the HLA test results) shall be considered and to enter an order of filiation pursuant to Alan Castle's petition if he should prove to be the biological father. I would order that the paternity determination be completed prior to the circuit court's reconsideration of the petition for change of custody pursuant to our order of remand in the custody dispute appeal (Docket No. 66712).