GIRARD v WAGENMAKER

Docket No. 85662. Argued November 8, 1990 (Calendar No. 4). Decided May 7, 1991.

Larry G. Girard brought an action under the Paternity Act in the Muskegon Circuit Court against Judy Wagenmaker, claiming that he was the father of a child conceived and born while Wagenmaker was married to her husband, Harvey Wagenmaker. Girard sought a determination of the child's paternity, an order of filiation if he was found to be the biological father of the child, visitation rights, and a determination of support. Subsequently, Harvey Wagenmaker sought to intervene, asserting that he continuously accepted and supported the child as his own. The court, R. Max Daniels, J., ruled that the plaintiff did not have standing to bring the action because a prior determination that the child was born out of wedlock had not been obtained. In a supplemental opinion, the court found that Girard had no standing under the Child Custody Act to seek visitation rights, custody, or a determination of paternity. The Court of Appeals, GRIBBS, P.J., and WALSH and J. F. FOLEY, JJ., reversed, holding that under the Paternity Act the plaintiff had standing to seek a determination regarding the paternity of the child allegedly born out of wedlock, and found that a putative father's complaint is sufficient if it alleges facts sufficient to show that the child is not the issue of the marriage and that the plaintiff is the biological father of the child (Docket No. 88863). The defendant appeals.

In an opinion by Justice BRICKLEY, joined by Justices BOYLE and GRIFFIN, and an opinion by Justice RILEY, the Supreme Court held:

Neither the Paternity Act nor the Child Custody Act supports the standing of a putative father to bring an action to determine the paternity of a child born while the mother was married to another man.

1. The Paternity Act provides that a father or putative

REFERENCES

Am Jur 2d, Bastards §§ 85, 87.

Who may dispute presumption of legitimacy of child conceived or born during wedlock. 90 ALR3d 1032.

father of a child born out of wedlock may seek an order of filiation in the circuit court. The act defines a child born out of wedlock as a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or a child which the court has determined to be a child born during a marriage, but not the issue of that marriage. While the words of a statute must be given their ordinary construction according to their common and approved usage, a court may refer to the legislative intent when enacted. The intent can be ascertained from an examination of the language of the act, the subject matter under consideration, the scope and purpose of the act, and other preceding statutes. A literal construction of the language of the act, as well as its legislative history and analyses and subsequent case law, supports the conclusion that the plaintiff had no standing to bring a claim under the act. The mother clearly was married to her husband when the child was born, and at the time of the filing of the complaint there had been no prior determination by the circuit court that the child was not the issue of that marriage.

2. Because the plaintiff does not have standing under the Paternity Act, he is not a parent for purposes of the Child Custody Act, barring his child custody claim.

Justice RILEY concurred in the analyses of the Paternity Act and the Child Custody Act, but indicated that *Syrkowski v Appleyard,* 420 Mich 367 (1985), was incorrectly decided, and thus did not join in the analysis of that case.

Reversed.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the Paternity Act should be interpreted to afford the plaintiff the standing he seeks. The literal language of the statute includes within the definition of a child born out of wedlock a child born to a married woman, but not fathered by the husband. Nothing in the Paternity Act compels the conclusion that separate courts in separate proceedings must separately determine the paternity or nonpaternity of the husband and the putative father. The Paternity Act's central function is to provide a judicial forum to litigate and determine paternity, along with its consequent legal rights and obligations. Since 1941, the law has recognized that putative fathers had independent standing to seek determinations of their paternity in the circuit court. There is no basis in reason, logic, or any applicable statute to hold that a putative father by artificial insemination should have any greater right or preferred standing to litigate his paternity than any other putative father. Nor is there any reason why the act's concededly predominant pur-

pose of facilitating support for children born out of wedlock should be thought to militate affirmatively against the standing of a putative father who desires voluntarily to shoulder his parental responsibility. The only reasonable reading of the language of the Paternity Act, as previously interpreted by this Court, compels the conclusion that the Legislature has authorized paternity actions such as this case, or, if it does not compel that conclusion, the balance of interests weighs in favor of permitting them.

Denying putative fathers a legal forum in which to press their claims will not prevent such claims from being made. There is no question that in a dispute concerning a biological father's right to develop or maintain any actual relationship with his child—once it is established that he is the biological father—the ultimate governing standard would be the best interests of the child, but this governing factor can best be considered individually in the very hearing the putative father seeks following the threshold determination of paternity. Upholding a putative father's standing to bring his paternity claim does not in any way endorse or prejudge his claim to provide support to the child, or his claim to custody or visitation; but to deny him standing to bring his claim is inherently unjust. Nor does the fact that he may not ultimately succeed on the merits justify denying him his day in court.

Finally, a father's interest in establishing and maintaining a relationship with his child unquestionably falls within the scope of the liberty guaranteed by the Due Process Clause of Const 1963, art 1, § 17, so as to afford the plaintiff standing under the Paternity Act.

Justice MALLETT took no part in the decision of this case.

173 Mich App 735; 434 NW2d 227 (1988) reversed.

PARENT AND CHILD — PATERNITY ACT — CHILD CUSTODY ACT — PUTATIVE FATHERS — STANDING.

Neither the Paternity Act nor the Child Custody Act supports the standing of a putative father to bring an action to determine paternity of a child born while the mother was married to another man (MCL 722.711-722.730; MSA 25.491-25.510, MCL 722.21-722.28; MSA 25.312[1]-25.312[8]).

*Vander Ploeg, Ruck, Luyendyk & Wells* (by *Robert S. Engel*) for the plaintiff.

*Paul M. Ladas* for the defendant.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *George H. Weller,* Assistant Attorney General, for the Attorney General.

*Katherine L. Barnhart* for the Family Law Council of the State Bar of Michigan.

BRICKLEY, J. The Court granted leave in this case to resolve two issues.[1] The first issue is whether the plaintiff, a putative father, has standing to bring an action under the Paternity Act as it existed in 1985, MCL 722.711-722.730; MSA 25.491-25.510, to determine the paternity of a child born while the mother was legally married to another man.[2] A second and similar issue to be decided if we find the Paternity Act unavailing to the plaintiff is whether a putative father has standing to bring the same action under the Child Custody Act, MCL 722.21-722.28; MSA 25.312(1)-25.312(8).[3]

---

[1] The Court originally granted leave solely to review the question presented under the Paternity Act, MCL 722.711-722.730; MSA 25.491-25.510. 432 Mich 921 (1989). However, the Court subsequently granted unlimited review, but specified the two present issues. 435 Mich 858 (1990).

[2] The Court of Appeals analyzed this case under the Paternity Act's 1986 amendment which added the words "or conceived" to the definition of a child born out of wedlock. Because this suit was commenced in 1985, the plaintiff's claims would generally be more appropriately analyzed under the act as it existed in 1985. However, under the 1986 amendment the result would not be different because the child was conceived and born while Wagenmaker was married to her current husband.

[3] Although Girard referred to *Michael H v Gerald D,* 491 US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989), to support a policy argument in favor of standing, he did not raise any constitutional attack against the Paternity Act in his pleadings, his briefs, or his arguments at each level of appeal. In addition, neither the trial court nor the Court of Appeals reviewed the constitutionality of denying standing to a putative father under the Paternity Act. Because we also are limited

On the basis of our interpretation of the Paternity Act, we hold that the Legislature did not express an intention to grant a putative father standing to establish the paternity of a child born while the mother was legally married to another man without a prior determination that the mother's husband is not the father. We also conclude that a putative father does not have standing to make a similar claim under the Child Custody Act.

## I. FACTS

This dispute began on May 10, 1985, when Larry Girard filed a complaint against Judy Wagenmaker, claiming that he was the father of a child conceived and born while Wagenmaker was married to her husband, Harvey Wagenmaker. The complaint by Girard acknowledged that Harvey Wagenmaker was the husband of Judy, but alleged that the child was not a child of the marriage. The complaint requested a determination of the child's paternity, an order of filiation if Girard was found to be the biological father of the child, visitation, and a determination of support.

Subsequently, on June 19, 1985, Harvey Wagenmaker filed a petition for intervention, stating that the child was conceived and born during his marriage with Wagenmaker, and that he continuously accepted and supported the child as his own. On the same day, Judy Wagenmaker filed a motion for summary disposition, alleging, as in this Court, that Girard did not establish that the child was "born out of wedlock," MCL 722.711(a); MSA

to the issues raised on appeal, MCR 7.302(F)(4)(a), we do not review any constitutional questions. Furthermore, even if we were to review the constitutionality of the Paternity Act, we note that Girard admitted that the Paternity Act is not as preclusive as the California statute that was upheld by the United States Supreme Court in *Michael H.*

25.491(a). She argued that a prior determination by a circuit court of the issue whether a child was born out of wedlock was necessary to contest paternity, and that no such determination had been previously obtained.

In a written opinion, R. Max Daniels, presiding judge of the Muskegon Circuit Court, ruled that Girard did not have standing to bring a paternity action in the circuit court. Judge Daniels stated that most paternity claims generally arise when a divorce occurs, and, because this aspect was missing from the present case, Girard did not have standing under the Paternity Act. Judge Daniels declared that the words "which the court has determined" under the definition of child born out of wedlock, MCL 722.711(a); MSA 25.491(a), mean a prior determination that the child was born out of wedlock must be obtained before bringing a paternity action. Judge Daniels concluded that a "self-proclaimed father" did not have standing to seek a determination under the Paternity Act. In a supplemental opinion Judge Daniels also held that Girard had no standing under the Child Custody Act to ask for "visitation, custody or determination of paternity . . . ."[4]

On appeal, the Court of Appeals overturned the trial court's decision. 173 Mich App 735; 434 NW2d 227 (1988). In holding that a man claiming himself to be the biological father of a child had standing even if the mother is married to another man at the time of conception and birth, the Court of Appeals stated that a putative father does not "need a judicial determination that the child is a child born out of wedlock at the time that [the putative father] filed the complaint." *Id.* at 741.

---

[4] After the trial court dismissed his Paternity Act claim, Girard moved to amend his pleadings to add a claim under the Child Custody Act.

The Court of Appeals based its decision on a belief that the language "which the court has determined" in MCL 722.711(a); MSA 25.491(a) did not limit a putative father's standing. The Court found that the putative father's complaint is sufficient if "it alleges facts sufficient to show that the child is not the issue of the marriage and that plaintiff is the biological father of the child." *Id.* at 740. Therefore Girard had standing under the Paternity Act to seek a determination regarding the paternity of the child allegedly born out of wedlock. *Id.* at 741.

This Court granted leave to appeal to determine whether a putative father can obtain standing under either the Paternity Act or the Child Custody Act to dispute the paternity of a child born while the natural mother is married to another man. 435 Mich 858 (1990).

## II. THE PATERNITY ACT

### A

Although this Court has previously reviewed the Paternity Act, this case presents a novel question. At issue is the following statutory language:

> *The father or putative father of a child born out of wedlock may file a complaint in the circuit court* in the county in which the child or mother resides or is found, praying for the entry of the order of filiation as provided for in section 7. [MCL 722.714(6); MSA 25.494(6). Emphasis added.]

> "Child born out of wedlock" means a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or *a child which the court has determined to be a child born during a marriage but not the issue of that marriage.* [MCL 722.711(a); MSA 25.491(a). Emphasis added.]

To determine whether Girard can bring an action under the Paternity Act, the Court must interpret the terms "which the court has determined" within the definition of a "[c]hild born out of wedlock," MCL 722.711(a); MSA 25.491(a).

The Court is bound by a number of rules of statutory construction when it interprets statutes. Although the proper construction of any statute is for the courts, *Lakehead Pipe Line Co v Dehn,* 340 Mich 25, 35; 64 NW2d 903 (1954); *Webster v Rotary Electric Steel Co,* 321 Mich 526, 531; 33 NW2d 69 (1948), this Court must still give the statute a valid and reasonable construction that will reconcile any inconsistencies and give effect to all its parts. *Aikins v Dep't of Conservation,* 387 Mich 495, 499; 198 NW2d 304 (1972); see also *In re Petition of State Hwy Comm,* 383 Mich 709, 714-715; 178 NW2d 923 (1970) (citing *Evans Products Co v State Bd of Escheats,* 307 Mich 506; 12 NW2d 422 [1943]). While the words of a statute must be given their ordinary construction according to their common and approved usage, MCL 8.3a; MSA 2.212(1);[5] *State ex rel Wayne Co Prosecuting Attorney v Levenburg,* 406 Mich 455; 254 NW2d 810 (1979), the Court can also refer to the legislative intent in passing the statute to find an appropriate interpretation. *Crawford v School Dist No 6,* 342 Mich 564, 568; 70 NW2d 789 (1955) (citing *In re School Dist No 6, Paris & Wyoming Twps,* 284 Mich 132, 143-144; 278 NW 792 [1938]). This legislative intent can be ascertained from examining

---

[5] This statute provides:

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.

the language of the act, the subject matter under consideration, the scope and purpose of the act, and other preceding statutes. *Id.*

In 1820, the Legislature enacted the first act similar to the Paternity Act. May 8, 1820 (1 Laws of the Territory of Michigan 640 [1871]). This act, entitled "AN ACT for the support and maintenance of Illegitimate Children," 1 Laws of the Territory of Michigan 643 (1871), underwent subsequent changes in 1827 and 1838. See 2 Laws of the Territory of Michigan 581 (1874); 1838 RS, part 1, tit IX, ch 6. In 1846 the act was reentitled the Bastardy Act and further amendments followed over the years. 1846 RS, tit IX, ch 42; 1857 CL, tit XV, ch 43; 1871 CL 1973; 1882 How Anno Stat 2004; 1897 CL 5901; 1915 CL 7753; 1929 CL 12910.

In 1941, the Bastardy Act of 1846 was amended to allow the father of an illegitimate child to bring a claim in the circuit court to prevent the issuance of a warrant of prosecution against the alleged father:

> The father of an illegitimate child may file a bill of complaint in the circuit court . . . . [*T*]*he pendency of a bill of complaint filed therefor shall be a bar to the issuance of a warrant or prosecution thereof upon complaint as authorized by this chapter,* in case such complaint is made after the filing of such bill of complaint. [1941 PA 316, ch 42, § 12. Emphasis added.]

In 1956, the Paternity Act underwent substantial revisions. 1956 PA 205, MCL 722.711-722.730; MSA 25.491-25.510. With these revisions the Legislature attempted to rid the statute of its criminal aspects. See *Bowerman v MacDonald,* 431 Mich 1, 5; 427 NW2d 477 (1988). Under the 1956 revisions, the Paternity Act allowed a father or putative father to file a complaint in the circuit court. 1956

PA 205, MCL 722.714(f); MSA 25.494(f). However, for the complaint to be proper, the Legislature required the plaintiff to be the father of a "child so born out of wedlock under this act . . . ." *Id.* The history of the Paternity Act to this point not only shows the Legislature's concern with the support of illegitimate children, *Artibee v Cheboygan Circuit Judge,* 397 Mich 54; 243 NW2d 248 (1976), but also indicates that the Legislature, even while broadening the rights of putative fathers to file suit under the act, continues to include limitations on the accessibility to the Paternity Act.

In 1980, the Legislature again amended the Paternity Act, expanding the definition of a child born out of wedlock to include "a child which the court has determined to be a child born during a marriage but not the issue of that marriage." 1980 PA 54, MCL 722.711(a); MSA 25.491(a). The 1980 amendment originated in HB 4389 in the House of Representatives. House Legislative Analysis, HB 4389, April 11, 1979.

This amendment came about for two reasons. First, this Court decided *Serafin v Serafin,* 401 Mich 629; 258 NW2d 461 (1977), which abrogated Lord Mansfield's Rule and stated that the presumption of legitimacy can be rebutted by clear and convincing evidence. The Legislature believed that *Serafin* would leave natural mothers without any avenue to force a biological father to undertake parental responsibilities and leave "a gap in the law by which some children are deprived of access to support from their fathers . . . ." House Legislative Analysis, HB 4389, April 11, 1979.

Second, in July of 1979, the Court of Appeals decided *Smith v Robbins,* 91 Mich App 284, 288-289; 283 NW2d 725 (1979) (BASHARA, J.), in which it was stated:

> If our paternity statute is interpreted as creating a distinction between support provided for an illegitimate child of an unwed mother and the illegitimate child of a married mother, a clearly irrational classification exists and the statute will be rendered unconstitutional.

The Court of Appeals avoided the equal protection problem by defining "unmarried" to include "not lawfully married to the father of the child . . . ." *Id.* at 291. The Legislature obviously was concerned about such an unconstitutional distinction. *Syrkowski v Appleyard,* 420 Mich 367, 374; 362 NW2d 211 (1985).

The last amendment of the Paternity Act occurred in 1986, after the present suit was initiated. The 1986 amendment added the term "or conceived" to the definition of a child born out of wedlock. 1986 PA 107, MCL 722.711(a); MSA 25.491(a).

With this background in mind, we turn to the issues presented in this case.

B

MCL 722.714(f); MSA 25.494(f), as it existed in 1985, stated that "[t]he father or putative father of a child so born out of wedlock may file the complaint" in the circuit court. This right was defined in the section that set forth the general procedural requirements under the Paternity Act. MCL 722.714; MSA 25.494. Because a man can only file a complaint to determine paternity if he is the father or putative father of a child "born out of wedlock," we focus our attention on the definition of that term.

The Paternity Act defined a child born out of wedlock as "a child begotten and born to a woman who was not married from the conception to the

date of birth of the child, *or* a child *which the court has determined* to be a child born during a marriage but not the issue of that marriage." MCL 722.711(a); MSA 25.491(a). (Emphasis added.) Girard obviously cannot meet the requirements of the first clause. The facts of this case clearly indicate that Wagenmaker was married to Harvey Wagenmaker when the child was born.

To meet the requirements of the second clause under the statutory definition, there must exist a child born out of wedlock—a child which the court has determined to be a child born during, but not the issue of, the natural mother's marriage. Using the common and approved usage of the terms in the statute, *Aikins, supra,* we find that a literal construction of this clause, coupled with the filing requirement clause, requires a prior court determination that a child is born out of wedlock.

In the second clause of the born out of wedlock definition, the Legislature used the term "which the court has determined" to define one of the necessary requirements to find that a child is born out of wedlock. "[H]as determined" is the present perfect tense of the verb "determine." The present perfect tense generally "indicates action that was started in the past and has recently been completed or is continuing up to the present time," Sabin, ed., *The Gregg Reference Manual* (New York: McGraw-Hill, 6th ed, 1985), ch 10, p 192, or shows "that a current action is logically subsequent to a previous recent action." Ray & Ramsfield, *Legal Writing: Getting It Right and Getting It Written* (St Paul: West Publishing Co, 1987), p 229. For a putative father to be able to file a proper complaint in a circuit court, MCL 722.711(a); MSA 25.491(a), a circuit court must have made a determination that the child was not the issue of the *marriage at the time of filing the*

*complaint.* The facts in this case indicate Girard
cannot meet this requirement. No previous action
was ever undertaken to determine the child's pa-
ternity. Furthermore, no ongoing actions existed to
determine the child's paternity when Girard filed
his paternity claim against Wagenmaker. There-
fore, Girard cannot meet the requirements under
either the first or the second clause in the defini-
tion of a child born out of wedlock. Because MCL
722.714(f); MSA 25.494(f) requires that Girard be
the father of a child born out of wedlock, he
cannot file a proper complaint and has no standing
to bring a claim under the Paternity Act.

Not only is this outcome required by the plain
language of the Paternity Act, but it is the only
reasonable construction of the Paternity Act which
will give effect to all its parts as a whole. Adopting
Girard's view of the meaning of the statute would
have us read "has determined" to mean "may
determine." Or, more precisely, had the Legisla-
ture intended the standing provision to operate as
the plaintiff suggests, it would have omitted from
the definition of "out of wedlock" the words "a
child which the court has determined to be."

Therefore, even if we were willing to overlook
such an alteration of the plain meaning of the
words of this section, we would then have to
explain why the Legislature would use those words
before the second prong of the out of wedlock
definition, but not the first. Would it mean that
where the allegation is that the child was "begot-
ten and born to [an unwed] woman" no determina-
tion has to be made to that effect in the course of
the paternity proceedings because the clause is not
preceded by the words "which the court has deter-
mined"? To accept the plaintiff's reading, we ei-
ther have to answer that question in the affirma-
tive or declare the words "has determined" preced-

ing the second prong of the out of wedlock definition a nullity.

Finally, because we are dealing with standing, the question is what the plaintiff must allege at the time of filing. If the plaintiff sought access to the court under the first clause of the out-of-wedlock definition, he would only need to allege that the mother was not married at the time of birth or conception. He would not have to allege that a circuit court "has determined" such facts. But when the plaintiff sought access under the second clause, he must, by the very wording of that clause, allege that a "court has determined" that the child was not the issue of the marriage. Again, to suggest otherwise would be to declare those words a nullity. The Court must give meaning to all the words in the statute, *Aikins, supra,* because " 'it will not be presumed that the legislature intended to do a useless thing . . . .' " *Klopfenstein v Rohlfing,* 356 Mich 197, 202; 96 NW2d 782 (1959). Giving proper weight to each and every clause, we must reach the conclusion that a prior determination of paternity is required under the second clause in the definition of a child born out of wedlock.

This literal interpretation of the 1980 amendment, "which the court has determined to be a child born during a marriage but not the issue of that marriage," is buttressed by the legislative analysis when the amendment was adopted. While recent developments in the Paternity Act certainly indicate an intent to allow the biological father access to a circuit court, this trend is not the principal focus of the Legislature's 1980 amendments. The legislative history and analyses indicate the Legislature's concern that the natural mother would not be protected in the case of divorce and support proceedings. The Legislature

wanted to allow the natural mother to obtain support from the biological father of a child born out of wedlock where support from the legal father of the child was jeopardized.

One analysis of the Paternity Act stated:

> *In divorce and support cases,* the court now may admit the husband's testimony disputing paternity, and in the light of clear and convincing evidence, may release the husband from parental and child support responsibilities. *The mother of the child at this point has no avenue in the courts* to force the biological father of the child to assume parental responsibilities, because the Paternity Act by which such determinations are made applies only to a child whose mother was unmarried from the child's conception to its birth[,] . . . a situation which could be corrected by amending the Paternity Act to include such children. [House Legislative Analysis, HB 4389, April 11, 1979. Emphasis added.]

In fact, one of the arguments for the amendment to include children born during a marriage, but not the issue of a marriage, stated:

> If a man who was married to a woman at the time of her child's birth convinces the court that he is not the father of the child, *the law now provides no procedure to legally identify the father and require him to provide support for the child.* Thus, the court may decide *who is not the father* of a child, but may not then entertain the question of who is. *The bill would correct this. [Id.* Emphasis added.]

Finally, the House Legislative Analysis of HB 4389 also states:

> The bill would amend the Paternity Act to include in the definition of a "child born out of

wedlock" a child whose *mother was married* at the
time of the birth but whose father, in the determi-
nation of the circuit court, was not the mother's
husband. [Emphasis added.]

These legislative analyses of the 1980 amend-
ments are clearly concerned with what actions a
mother can take, not the rights of a father or
putative father to claim paternity. The analyses
also indicate that the Legislature, in enacting the
1980 amendments, was contemplating situations
where a court in a prior divorce or support pro-
ceeding determined that the legal husband of the
mother was *not* the biological father of the child.
This concern supports our conclusion that a prior
determination of paternity must have occurred
before the putative father, or the mother, can file
a complaint to determine who *is* the biological
father and determine the putative father's support
obligations.

We also think the literal reading of the "has
determined" language to require a prior determi-
nation that the child is not the issue of a marriage
comports with the traditional preference for re-
specting the presumed legitimacy of a child born
during a marriage. *Serafin, supra* at 636. A child
born to a mother who is unmarried does not enjoy
such a presumption, and, therefore, it makes sense
that the Legislature would require a prior determi-
nation in the second prong of the born out of
wedlock definition, but not in the first.

While one could argue that the Legislature was
also concerned with the ability of the circuit court
where the paternity action was pending to decide
who was the father of the alleged child born out of
wedlock, House Legislative Analysis, HB 4389,
April 11, 1979, that argument is not persuasive.
The language regarding the circuit court actually

comports with the Legislature's overall concern
about the natural mother's rights in divorce or
support actions where the husband was deter-
mined not to be the biological father of the child.
Because allowing a putative father standing in a
paternity action does not promote this concern,
our only possible conclusion can be that the pres-
ent circuit court cannot decide paternity without
meeting the prior determination requirement.
Therefore, not only does the language of the Pater-
nity Act itself require a holding that a putative
father does not have standing in this situation, but
the legislative history and analyses argue for the
same result.

Even though this Court has previously inter-
preted the Paternity Act, those interpretations do
not require a different result. Most of the prior
cases review the purpose of the Paternity Act and
are not dispositive. See *Artibee, supra; Whybra v
Gustafson,* 365 Mich 396, 400; 112 NW2d 503
(1961). *Bowerman, supra,* is also not dispositive.

In *Syrkowski, supra,* we dealt with a situation
where a claim under the Paternity Act was
brought by a third party. In a per curiam decision,
we stated:

> The circuit court has subject-matter jurisdiction
> over an action to identify the father of a child
> born out of wedlock. Any other conclusion requires
> an impossibly restrictive and unnecessary inter-
> pretation of the statutory language.
> The plaintiff seeks only a paternity act determi-
> nation that he is the biological father of Teresa
> Syrkowski. The act was created as a procedural
> vehicle for determining the paternity of children
> "born out of wedlock," and enforcing the resulting
> support obligation. The plaintiff is requesting the
> Court to determine the status of the child and his
> biological paternity. The act allows fathers to seek

and receive such determinations. We hold that the
circuit court does have subject-matter jurisdiction.
[*Id.* at 375.]

Our holding here does not necessarily conflict
with our narrow holding in *Syrkowski* that a
circuit court has subject matter jurisdiction over
an action brought by a putative father in a surro-
gate parenting context. *Syrkowski* dealt with the
subject-matter jurisdiction of a circuit court under
§ 4 of the Paternity Act. See former MCL
722.714(c); MSA 25.494(c). In this case, however,
we are concerned with the standing of individual
plaintiffs and the interpretation of the "has deter-
mined" clause in § 1, MCL 722.711(a); MSA
25.491(a). *Syrkowski* also assumed the out-of-wed-
lock definition was met.

Finally, because a certificate of nonconsent was
filed in *Syrkowski,* the out-of-wedlock issue, while
not articulated in our opinion in that case, may
well have been determined on the peculiar circum-
stances of the interaction of the Paternity Act and
MCL 333.2824(6); MSA 14.15(2824)(6).[6] Our holding
today does not change this analysis and reviews
different issues than those decided in *Syrkowski.*

C

The dissent dismisses our analysis as unsup-
ported by whatever "scant legislative history ex-
ists," *post,* p 257, and then, without support from
the text or the legislative background of the Pater-
nity Act, attempts to justify the standing of the
putative father of a presumptively legitimate child
of another man married to the child's mother.

---

[6] "A child born to a married woman as a result of artificial insemi-
nation, *with consent* of her husband, is considered to be the legitimate
child of the husband and wife." (Emphasis added.) Arguably a statu-
tory nonconsent form is the equivalent of a prior rebuttal of a child's
legitimacy.

The legislative history is indeed scant because the purpose of the paternity legislation during that 182-year history was clear and obvious. The earliest act was entitled "AN ACT for the maintenance and support of illegitimate children." February 4, 1809, 4 Laws of the Territory of Michigan, p 46. Subsequent enactments carried nearly identical titles until its more ignominious appellation of the "Bastardy Act" in 1846. 1846 RS, tit IX, ch 42.

The only recognition of independent standing for the putative father, and then only when the child is born to a woman not married from the conception to the date of birth, was the 1941 enactment whereby a putative father was given the standing and opportunity, not to provide the putative father a "legal forum or procedure to claim his alleged paternal status," *post*, p 262, but to pray for the entry of a "decree providing for the support of such child" unless a proceeding for an order to that effect was already commenced. 1941 PA 316, § 12. The acknowledged purpose of this provision, seen by the dissent as designed to satisfy the paternal instincts of the father, was to give the putative father an opportunity to forestall a warrant upon the action of the mother of the illegitimate child. This legislative intent becomes very clear when it is recognized that the 1941 enactments also added a specific statement to that effect.

The dissent also attacks our interpretation of the 1980 amendment for denying the putative father standing—not the standing he acquired by virtue of the 1941 amendment, but to contest his paternity over a child born within a marriage to another man—"precisely when *he needs* [it] the most" (*post*, p 262) (emphasis supplied); and for visiting "hardship and injustice" (*id.*) on the plaintiff. Only after a construction of the 1980 out-of-

wedlock amendment to satisfy this solicitude for
the plight of the plaintiff does the dissent state:

> I frankly do not understand why the Paternity
> Act's concededly predominant purpose of facilitat-
> ing support for children born out of wedlock
> should be thought to militate affirmatively *against*
> the standing of a putative father in a case like the
> one before us. The unfortunate fact that, in our
> society, the act's primary utility lies in compelling
> unwilling and recalcitrant fathers to meet their
> support obligations is no reason to deny standing
> to those fathers who desire to acknowledge their
> paternal responsibilities. [*Post,* p 269. Emphasis in
> original.]

We do not denigrate the dissent's genuine and
thoughtful concerns over the moral dilemma be-
tween the paternal needs of the biological father
and those of the presumptively legitimate child.
We only find that the Legislature has made its
choice and the answer to the dissent's concerns
will have to come from that body.

In the meantime, the dissent has posed our
dilemma as the interpreters of legislative intent
better and more succinctly than we have in the
entirety of this opinion by stating: "It is surely a
bit late to talk of preserving the 'sanctity' of the
marital family by the time a situation like the one
alleged in this case has arisen." *Post,* p 271. We
could not agree more. The Legislature has for 182
years now chosen to protect this "sanctity," and
that choice prompts its preference to avoid a chal-
lenge to a presumed legitimate birth until a prior
determination rebuts legitimacy and threatens the
child's support by exposing the fact that the pre-
sumed father is not the biological father. As de-
scribed in our legislative analysis above, this situa-
tion is precisely what concerned the Legislature in

their 1980 amendment and precisely what they said in the language that was adopted.

### III. THE CHILD CUSTODY ACT

The remaining question, whether a putative father has standing under the Child Custody Act, MCL 722.21-722.28; MSA 25.312(1)-25.312(8), to bring an action to determine the paternity of a child born while the mother was married to another man, can also be resolved now that we have held that the plaintiff does not have standing under the Paternity Act.

We note that a proper action to determine paternity should be brought under and governed by the provisions of the Paternity Act. See *Pizana v Jones,* 127 Mich App 123, 127; 339 NW2d 1 (1983). Once the trial court determined that Girard, a putative father of a child born to a woman married to another man, did not have standing to contest paternity under the Paternity Act, Girard clearly could not obtain a determination that he was the natural or biological father of the child under the Child Custody Act. Because Girard could not obtain a determination that he was a parent of Wagenmaker's child, Girard must be considered a nonparent under the Child Custody Act and his child custody claim is barred. *Ruppel v Lesner,* 421 Mich 559, 565; 364 NW2d 665 (1984).[7]

---

[7] In *Ruppel,* we stated:

> [W]here a child is living with its parents, and divorce or separate maintenance proceedings have not been instituted, and there has been no finding of parental unfitness in an appropriate proceeding, the circuit court lacks the authority to enter an order giving custody to a third party over the parents' objection.

Although the Court of Appeals in *In re Paternity of Flynn,* 130 Mich App 740, 759-760; 344 NW2d 352 (1983), determined that a

IV. CONCLUSION

Neither the statutory or the legislative analyses of the Paternity Act nor the analyses of the Child Custody Act support the position of Girard. Neither the Paternity Act nor the Child Custody Act supports the standing of a putative father to bring an action to determine the paternity of a child born while the mother was married to another man. Therefore, we conclude that Girard has no standing to bring an action to determine the paternity of Judy and Harvey Wagenmaker's child. We reverse the decision of the Court of Appeals and reinstate the summary dismissals granted by the Muskegon Circuit Court.

BOYLE and GRIFFIN, JJ., concurred with BRICKLEY, J.

RILEY, J. (*concurring*). I concur with the majority opinion with respect to the Paternity Act analysis, and also with respect to the Child Custody Act analysis. However, I write separately to indicate that I did not participate in *Syrkowski v Appleyard,* 420 Mich 367; 362 NW2d 211 (1985), and, having had the opportunity to review that case, I am persuaded that it was incorrectly decided. Thus, I do not join in the majority's *Syrkowski* analysis in § II(B).

---

putative father could bring an action under the Child Custody Act to determine paternity, that decision is not persuasive. First, the *Flynn* panel relied on the decision in *Winsett v Donaldson,* 69 Mich App 36; 244 NW2d 355 (1976), a case which is brought into question by legislative changes in the Paternity Act and our decision in *Ruppel.* See *Pizana, supra* at 127. Second, *Flynn* was decided one year prior to the decision in *Ruppel.*

CAVANAGH, C.J. (*dissenting*).

## I. INTRODUCTION

The majority's decision in this case denies the plaintiff any standing even to cross the threshold of the courthouse door in his claim to a hearing on whether he is the natural father of the child at issue.[1] The majority rejects the literal meaning of the Paternity Act, imposes an untenable construction on that law fraught with anomalies and injustice, implicitly overrules both the reasoning and the result of this Court's decision in *Syrkowski v Appleyard,* 420 Mich 367; 362 NW2d 211 (1985), and throws into grave doubt the constitutional validity of the Paternity Act.

## II. THE PATERNITY ACT

### A. THE STATUTORY BACKGROUND

The majority begins, as do I, by quoting the language of the two relevant provisions of the Paternity Act:[2]

The father or putative father of a child born out of wedlock may file a complaint in the circuit court in the county in which the child or mother resides or is found, praying for the entry of the

---

[1] Neither the child's mother, Judy Wagenmaker, nor Judy's husband, Harvey Wagenmaker, has ever denied that Girard is in fact the father of the child. This failure is not itself evidence that he is the father, of course, but this Court must decide this case on the assumption that he is. As the Court of Appeals correctly noted, the trial court's summary disposition on the pleadings, in effect holding that Girard had failed to state a claim on which relief could be granted, see MCR 2.116(C)(8), can be affirmed "only if the pleadings are so clearly unenforceable as a matter of law that no factual development can justify a right of recovery." 173 Mich App 735, 738; 434 NW2d 227 (1988), citing *Chapin v Coloma Twp,* 163 Mich App 614, 616-617; 415 NW2d 221 (1987). "The allegations of fact in the complaint and all reasonable inferences drawn from those allegations are accepted as true for purposes of the motion." *Chapin,* 163 Mich App 617.

[2] For the sake of convenience to the bench and bar, I shall quote the present, revised version of both provisions.

order of filiation as provided for in [MCL 722.717; MSA 25.497]. The mother of the child shall be made a party defendant and notified of the hearing on the complaint by summons which shall be in such form as the court shall determine and shall be served in the same manner as is provided by court rules for the service of process in civil actions. The court, following the hearing, may enter an order of filiation which shall have the same effect, be subject to the same provisions, and enforced in the same manner as an order of filiation would be if entered on complaint of the mother. [MCL 722.714(6); MSA 25.494(6).]

"Child born out of wedlock" means a child begotten and born to a woman who was not married from the conception to the date of birth of the child, or a child which the court has determined to be a child born or conceived during a marriage but not the issue of that marriage. [MCL 722.711(a); MSA 25.491(a).]

In this case, Girard, the putative father, alleges that the child was begotten and born to Judy Wagenmaker during the latter's marriage to Harvey Wagenmaker, but is not the issue of that marriage, being rather the issue of himself and Judy Wagenmaker. In my view, a literal reading of the statutory language resolves this case—which at this stage involves nothing more than the threshold issue of standing—in Girard's favor, without further ado. The majority, however, disagrees.

In order to understand the present state of the law regarding paternity claims it is necessary to review several recent historical developments. I will not attempt to retrace Justice BRICKLEY's careful and scholarly discussion of the historical lineage of Michigan's paternity laws dating back to 1809. It suffices, for present purposes, to note

that prior to 1977, not only did the legal definition of a "child born out of wedlock" exclude a child born to a married woman but fathered by someone other than the woman's husband, but there existed a virtually irrebuttable presumption, known as "Lord Mansfield's rule," that a child born to a married woman was fathered by the husband. This Court rejected Lord Mansfield's rule in *Serafin v Serafin,* 401 Mich 629; 258 NW2d 461 (1977), and held that the presumption of legitimacy could be rebutted by clear and convincing evidence. See *id.* at 636.[3]

Unfortunately, *Serafin* created an anomaly in Michigan law. While a husband could now effectively disown a child of his wife and thereby escape his support obligation by rebutting the presumption of legitimacy, Michigan law still did not recognize a child in that situation as having been "born out of wedlock," and therefore did not permit a paternity claim against the actual father. Thus, while an unmarried woman had legal recourse for support of a child against the natural father, a married woman whose child was not fathered by her husband could be denied recourse against either the husband or the natural father.

The Court of Appeals responded to this "gap in the law,"[4] and the grave constitutional problems it raised, in *Smith v Robbins,* 91 Mich App 284; 283 NW2d 725 (1979). In order to avoid finding the Paternity Act's definition of children born "out of wedlock" unconstitutional,[5] *Smith* construed that

---

[3] This Court found that the ancient policy reasons behind Lord Mansfield's rule, always somewhat murky and dubious, were no longer persuasive in today's world. See *id.* at 633-635.

[4] See House Legislative Analysis, HB 4389, April 11, 1979.

[5] *Smith* found, in light of *Serafin,* that the statutory definition of children born "out of wedlock," if literally construed, would be unconstitutional under the Equal Protection Clause as articulating an irrational classification of children born out of wedlock. See *id.* at 287-289.

definition to encompass a child born to a married woman but not fathered by her husband. See *id.* at 289-291.

The Legislature also responded to the anomaly created by *Serafin.* Essentially following *Smith,*[6] it amended the statutory definition of children born "out of wedlock" to include "a child which the court has determined to be a child born during a marriage but not the issue of that marriage." 1980 PA 54. The outcome of this case revolves in large part around the true meaning of this 1980 amendment.

### B. THE STATUTORY LANGUAGE

The primary argument of the majority is that because the 1980 amendment of MCL 722.711(a); MSA 25.491(a) refers to "a child *which the court has determined* to be a child born during a marriage but not the issue of that marriage," a putative father must, *as a prerequisite to filing his paternity claim,* show that the child in question has *already been determined,* in some *previous judicial proceeding,* not to be the issue of the marriage. The majority claims not only that this is

---

[6] It appears the Legislature became aware of the problem created by *Serafin* under then-prevailing Michigan law even before the Court of Appeals decided the *Smith* case. Representative Geerlings introduced the House bill which became the 1980 amendment on March 28, 1979, and a legislative analysis succinctly describing the problem was issued on April 11, 1979. See House Legislative Analysis, HB 4389, April 11, 1979. *Smith* was not decided until July 10, 1979. Presaging the concerns stated in *Smith,* the legislative analysis noted that

> the *Serafin* decision has created a gap in the law by which some children are deprived of access to support from their fathers, and often must be supported on public welfare instead —a situation which could be corrected by amending the Paternity Act to include such children. [House Legislative Analysis, HB 4389, April 11, 1979.]

the "outcome required by the plain language" of the statute, but makes the remarkable assertion that this is "the only reasonable construction of the Paternity Act which will give effect to all its parts as a whole." *Ante,* p 243. Not only is the majority's interpretation unpersuasive as a literal construction of the words and unsupported by what scant legislative history exists, it makes no sense and produces anomalous results when the statutory scheme is considered in context as an integrated whole.

The majority relies heavily on the fact that the words "has determined" are in the present perfect tense, thereby suggesting that at the time the court considers the paternity claim, it will have already been determined that the child is not the issue of the marriage in question. Nothing about the use of the present perfect tense, however, requires the conclusion that the language refers to some *separate and prior* court proceeding. Rather, it would simply seem to indicate that before the ultimate question of paternity is resolved on the merits, it is necessary that "*the* court"—the very court hearing the paternity claim—*will have determined* that the child is not the issue of the marriage in question. Obviously, the latter finding is a prerequisite of the former, and must temporally precede it; that is in the very nature of the definition. But nothing compels the conclusion that *separate* courts in *separate* proceedings must *separately* determine the paternity (or nonpaternity) of the husband and the putative father.[7]

---

[7] The majority's literalist approach cuts both ways. It might be thought significant that the statutory language refers to "*the* court" rather than "*a* court." If the language were really meant to refer to some *prior* court finding that the child is not the issue of the marriage—quite possibly the finding of some court *other* than the precise one hearing the paternity claim—the phrase would more logically read "a child which *a* court has determined." The use of the

The majority asks "why the Legislature would use those words before the second prong of the out of wedlock definition, but not the first." *Ante,* p 243. After all, even without words referring to a "court determination," it would be clear that the court hearing the paternity claim would have to make the findings necessarily required by the statutory definition. A perfectly natural explanation comes to mind for this purported paradox. In the case of the first prong of the statutory definition, it is unlikely that there would ever be a serious factual dispute concerning whether a mother was married at the time of a child's birth. By contrast, there will frequently be a substantial factual dispute concerning whether a child born to a married woman is or is not the issue of the marriage. Thus, the Legislature's use of the words "which the court has determined" may simply reflect a common-sense acknowledgment of the fact that the court will usually be called upon to make a substantial inquiry into that contentious issue.

The majority suggests that the statute might more easily bear the meaning urged here if it referred to "a child which the court *determines* [present tense] to be a child born during a marriage but not the issue of that marriage," or if the reference to a "court determination" were absent altogether. *Ante,* pp 243-246. This may well be, but it is no less true that far more comprehensible and clearcut language could have been chosen to express the meaning the majority forces upon the statute. The majority cites no evidence that the Legislature intended to place such extraordinary

words "*the* court" would seem to suggest that the statute is referring to *the very same circuit court which is hearing the paternity claim.* See MCL 722.711; MSA 25.491 ("As used in this act: . . . (d) 'Court' means the circuit court").

significance—leading to such anomalous results—
on the presence of the disputed words, or on the
fact that the present perfect tense, rather than the
present tense, is used.

It is true that the need to protect mothers and
children caught in the *Serafin*-created "gap,"
rather than the issue of the putative father's
standing to bring a paternity claim, was the "prin-
cipal focus" of the 1980 amendment. *Ante,* pp 245-
246, *quoting* House Legislative Analysis, HB 4389,
April 11, 1979. But this is not surprising or dispos-
itive, or even particularly relevant. The standing
of putative fathers was not directly at issue with
regard to the 1980 amendment because *the puta-
tive father's standing to bring a paternity claim
had long since been established under the Pater-
nity Act.* As the majority itself notes, it was in
1941—*thirty-nine years before the 1980 amend-
ment*—that the ancestor of the present Paternity
Act was amended to grant standing to putative
fathers to claim paternity of their children. See
*ante,* p 239; 1941 PA 316, ch 42, § 12. This provi-
sion has survived as modified into the present-day
Paternity Act as MCL 722.714(6); MSA 25.494(6).
The 1980 amendment had nothing to do with who
could bring a paternity action, but rather con-
cerned the scope of the definition of children born
out of wedlock.[8]

Indeed, what scant direct evidence we have of

---

[8] It is, of course, true that by expanding the scope of that definition,
the 1980 amendment, under either the reading urged here or the
majority's reading, necessarily expanded the number of potential
cases which could be brought by those possessing standing under the
Paternity Act. Again, it is certainly clear that the predominant goal
of the Legislature was to facilitate paternity claims by mothers whose
husbands have succeeded in rebutting their presumed paternity. But
the amendment *accomplished* that goal, not by tinkering with the
relative rights of mothers or putative fathers to bring paternity
claims, but by expanding the scope of the definition of children born
out of wedlock.

the Legislature's intent in enacting the 1980 amendment tends to refute the majority's interpretation. The brief, one-page legislative analysis, aside from noting the goal of closing the *Serafin* "gap" as discussed above, summarizes the amendment as follows:

> The bill would amend the Paternity Act to include in the definition of a "child born out of wedlock" a child whose mother was married at the time of the birth but whose father, *in the determination of the circuit court,* was not the mother's husband. [House Legislative Analysis, HB 4389, April 11, 1979. Emphasis added.]

Significantly, the legislative analysis renders the emphasized words as a prepositional phrase within a forward-looking conditional sentence describing what the act "would" do, undermining any notion that the Legislature vested peculiar importance in the present-perfect-tense phrasing of the actual statutory language. The language refers to the question whether the mother's husband is the father as something to be determined by "the circuit court," presumably the very same circuit court hearing the paternity claim itself. If the legislative analysis had envisioned the interpretation asserted by the majority, any number of more sensible and understandable ways could have been found to say so, such as by referring to "a child . . . whose father, *as previously determined by any court,* was not the mother's husband."

As the very title of the law indicates, and as this Court has held, the Paternity Act's central function is to provide a judicial forum to litigate and determine paternity, along with its consequent legal rights and obligations.[9] To be sure, in most

---

[9] See *Syrkowski v Appleyard,* 420 Mich 375: "The act was created

cases it is the abandoned or needy mother, or the Department of Social Services suing on her behalf, who is the claimant, and a predominant goal of the law is no doubt to facilitate the support of children born out of wedlock whose natural fathers are reluctant to acknowledge them. But since 1941 the law has also recognized that putative fathers themselves have independent standing to seek determinations of their own paternity.[10]

Yet the majority contends that the Paternity Act, having vested the circuit courts with jurisdiction to hear paternity claims, whether brought by the mother, the father, or the DSS, and having defined a child born to a married woman but not the issue of the marriage as a "child born out of wedlock," paradoxically denies to the very circuit court otherwise authorized to hear the paternity claim any authority to determine whether the child is in fact the issue of the marriage. Instead, according to the majority, the law mocks the putative father in Girard's position with a Catch-22 situation. He is turned away at the courthouse door and told that he has no standing to litigate his paternity claim unless *that very issue has already been litigated* in some prior proceeding. Yet the question whether his putative child is or is not "the issue of [the mother's] marriage" is, in part, *precisely* what he seeks to determine by filing his paternity claim in the first place.[11] Thus,

as a procedural vehicle for determining the paternity of children 'born out of wedlock,' and enforcing the resulting support obligation."

[10] I expand further on this point, and the policy issues surrounding it, in part II(D). In particular, I address in part II(D) the majority's and the Attorney General's unpersuasively narrow view of the purpose of the statutory provision now embodied in MCL 722.714(6); MSA 25.494(6).

[11] Where, as here, there are only two potential claimants to paternity, the paternity or nonpaternity of the putative father and the husband are simply two sides of the same coin, two ways of looking at the same fundamental issue. That fundamental issue—paternity—is

according to the majority, if a legal forum has *already* been provided to determine that question, the law provides yet another. But if no such forum has yet been provided, then the putative father, precisely when he needs one the most, is denied any forum at all.[12]

The hardship and injustice which the majority's construction works on the litigant in Girard's position is self-evident. He is denied any legal forum or procedure to claim his alleged paternal status, even though that status is cognizable under the substantive law. Furthermore, the majority concedes, as it must, that its interpretation would necessarily apply not only to paternity claims brought by putative *fathers* such as Girard, but also to those brought by *mothers* or the DSS. See *ante,* p 246. As the Court of Appeals noted, "[t]he allegations in [Girard's] complaint are the same as those which would be sufficient to support a complaint brought by the defendant mother." 173 Mich App 735, 740; 434 NW2d 227 (1988). It has never until this day, to my knowledge, been seriously suggested by any court in this state that a *mother* filing a paternity claim in this kind of

_____

precisely the issue for which the *Paternity* Act exists to provide a judicial forum for legal determination.

[12] Cf. Heller, *Catch-22* (New York: Simon & Schuster, 1961), p 46:

There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle.

"That's some catch, that Catch-22," he observed.

"It's the best there is," Doc Daneeka agreed.

situation must, in order to get through the courthouse door, present some prior court determination that the child in question is not the issue of her marriage.

The majority, which completely ignores this problem, perhaps assumes that its interpretation will not, in practice, affect many mothers bringing paternity claims. It is perhaps true that in the most common or typical case, a mother bringing such a claim will have gone through a prior divorce or support proceeding at which her former husband will have succeeded in disproving his presumed paternity. It is easy to hypothesize cases, however, in which it would be unlikely or impossible for the prior court determination to have taken place. Suppose the husband dies before any divorce proceeding? Is the mother then forever barred from proceeding against the natural father? Suppose the husband does not realize or accept the possibility of his nonpaternity, and fails or chooses not to litigate the issue during divorce proceedings? Where the husband or former husband dies or chooses not to renounce paternity of the child, are both the mother and the natural father forever barred from obtaining legal recognition of the natural father's status, even if the mother and natural father themselves subsequently marry and seek custody of their child?[13] The majority's rationale sweeps far more broadly than it cares to admit.

[13] These are not fanciful or imaginary hypothetical situations. A situation precisely analogous to one noted in the text occurred in *In re Paternity of Flynn*, 130 Mich App 740; 344 NW2d 352 (1983). In that case, Susan Flynn, while married to David Flynn, gave birth to a daughter, Jessica. Susan also had a sexual relationship with Alan Castle, who, as eventually alleged by himself and Susan, was Jessica's biological father. Susan and David each filed for divorce. They were each granted temporary custody of Jessica part-time. When the divorce became final, however, permanent custody was awarded to David. Susan and Alan then absconded with Jessica and lived under assumed names for several years. David discovered their whereabouts and reclaimed physical custody of Jessica. Meanwhile, Susan and Alan were married and filed a joint petition for custody of Jessica.

In sum, even if the textual interpretation issue could be regarded as close, the anomalous and unjust results produced by the majority's reading would alone counsel decisively against its adoption. See *Franges v General Motors Corp,* 404 Mich 590, 612; 274 NW2d 392 (1979) ("statutes should be construed to prevent absurdity, hardship, injustice or prejudice to the public interest").

## C. CONTROLLING PRECEDENT

The majority gives short shrift to perhaps the most serious obstacle to its interpretation of the 1980 amendment. That interpretation is squarely foreclosed by this Court's decision six years ago in *Syrkowski v Appleyard,* 420 Mich 367; 362 NW2d 211 (1985). The Court's decision today necessarily overrules both the result and the reasoning of *Syrkowski.* As the majority notes, the facts of *Syrkowski* were unusual and certainly distinguishable from this or most other paternity cases. *Syrkowski*'s reasoning and result, however, did not rest on the distinctions between that case and this one. Quite the contrary, *Syrkowski* reached the result it did on the basis of a straightforward interpretation of the plain language of the Paternity Act which, applied to this case, dictates ruling in Girard's favor.

*Syrkowski* was a collusive lawsuit involving a "surrogate mother" arrangement, in which the

---

Alan also filed a paternity claim. See *id.* at 746-748. The Court of Appeals held that Alan had no standing under the Paternity Act, although not for the reasons relied upon by the majority in this case. See *id.* at 752-755. The Court of Appeals held that Alan could press his paternity claim under the Child Custody Act, however, because paternity was a "fact of consequence" under the latter act in light of the presumption in favor of parental custody of MCL 722.25; MSA 25.312(5). See *id.* at 761. Judge HOOD, in a persuasive opinion, dissented from the Court of Appeals holding with regard to the Paternity Act, but concurred with regard to the Child Custody Act. *Id.* at 764-766.

natural mother and her husband coöperated with the natural father's efforts to obtain a legal determination of his paternity. *Syrkowski* is analogous to this case in that the putative father (Syrkowski) was seeking to claim paternity of a child (Teresa) born to a woman (Corinne Appleyard) who was and remained married (to Roger Appleyard). See *id.* at 369. The trial court and the Court of Appeals in *Syrkowski* held that subject-matter jurisdiction of this type of paternity claim did not exist under the Paternity Act. See *id.* at 368-369. This Court, however, unanimously reversed. *Id.* at 375.

A number of propositions are established with abundant clarity by *Syrkowski's* reasoning and holding. First, *Syrkowski* necessarily rejected the majority's interpretation of the 1980 amendment. It is clear that there was no separate or prior court determination in *Syrkowski* that the child was not the issue of the Appleyards' marriage. We specifically noted that Syrkowski *"is prepared to prove"* that the child "is a child born out of wedlock as defined by the Paternity Act. That *will bring* the child within the provisions of the act." *Id.* at 374 (emphasis added). Language does not get any clearer than this. The conclusion is inescapable that this Court in *Syrkowski* read the statute according to its literal meaning, to permit the determination whether the child was the "issue of th[e] marriage" to be made during the very proceeding brought under the Paternity Act by the putative father.

The majority's attempts to distinguish *Syrkowski* are unpersuasive. The majority asserts that *Syrkowski* dealt with the circuit court's subject-matter jurisdiction under the Paternity Act, rather than with the question of standing. This is a distinction without a difference. To hold that the circuit court has no statutory jurisdiction to enter-

tain a putative father's claim in this type of case, or that the putative father has no statutory standing to bring his claim, are merely two ways of stating the same thing. As a matter of basic jurisprudential philosophy, a party's lack of standing has often been said to deprive a court of jurisdiction over that party's claim. See *Allen v Wright,* 468 US 737, 750-751; 104 S Ct 3315; 82 L Ed 2d 556 (1984); *Los Angeles v Lyons,* 461 US 95, 101-102; 103 S Ct 1660; 75 L Ed 2d 675 (1983).[14]

*Syrkowski's* resolution of the "subject-matter jurisdiction" issue was clearly premised on its holding that the putative father in that situation has the statutory right to bring a paternity claim. After noting the statutory provision "authoriz[ing] . . . the father . . . to file a complaint alleging paternity," this Court noted that "[t]he same section confers jurisdiction upon the circuit court." 420 Mich 374. Then, evidently referring to both parts of this section, we stated: *"That language is as clear as statutory language can be. There is no need to interpret or look beyond the words of the statute to the intent of the Legislature." Id.* at 375 (emphasis added). We concluded our analysis in two short sentences, the first of which clearly addressed the issue of standing: *"The act allows fathers to seek and receive [paternity] determinations.* We hold that the circuit court does have subject-matter jurisdiction." *Id.* (emphasis added).

The majority suggests that *Syrkowski* did not address the interpretation of the "has determined" clause of the 1980 amendment. Even if the partic-

[14] The United States Supreme Court treated the concept of standing in these cases in light of the federal jurisdictional requirement of an actual "case or controversy" under US Const, art III, § 2. Michigan law embodies a similar requirement of an "actual controversy." See *Shavers v Attorney General,* 402 Mich 554, 588-589; 267 NW2d 72 (1978).

ular textual argument adopted by the majority were not urged in so many words by any party in *Syrkowski,* however, the specific language and holding of *Syrkowski* necessarily preclude the majority's conclusion. This Court chose in *Syrkowski* to reverse the lower courts' holdings in lieu of granting leave and without benefit of oral argument or plenary briefing, evidently because we found that the lower courts had clearly erred in the face of a literal reading of the statutory language. If the majority's present interpretation of the Paternity Act were correct, we would not and could not have ruled as we did in *Syrkowski,* because the putative father plainly would have had no standing to proceed and the circuit court would have lacked jurisdiction. The majority's decision in this case thus appears to overrule the result in *Syrkowski* and indicates that, in the majority's view, we should have affirmed the lower courts in that case.

Finally, the majority suggests that our decision in *Syrkowski* somehow rested on the fact that Roger Appleyard filed a certificate of nonconsent under MCL 333.2824(6); MSA 14.15(2824)(6), regarding his wife Corinne's artificial insemination by Syrkowski. Quite aside from the fact, as the majority itself concedes, that *Syrkowski* articulated no such theory, the majority does not explain how filing a § 2824(6) nonconsent form could operate to free a putative father like Syrkowski from the restrictions on standing created by the majority's statutory construction in the instant case. The mere assertion of nonconsent by the husband obviously could not even "[a]rguably," *ante,* p 248, n 6, constitute a "determination" by "the court" that the child conceived is "not the issue of the marriage," as the Paternity Act, according to the majority, requires as a prerequisite to standing.

More generally, I see no basis in reason, logic, or any of the applicable statutes for holding that a putative father by artificial insemination should have any greater right or more preferred standing to litigate his paternity than any other putative father.

Indeed, *Syrkowski* rejected precisely the same legislative purpose argument that the majority now relies upon. As noted in part II(B), the majority places special emphasis on the Paternity Act's predominant purpose of helping mothers obtain support from reluctant natural fathers and on the conceded goal of the 1980 amendment of serving this purpose by closing the *Serafin*-created "gap." *Syrkowski* and this case each involve situations concededly remote from this general and predominant statutory purpose. Yet *Syrkowski* rejected the notion that this general legislative intent somehow requires an incongruously cramped interpretation of the statutory language. "We can accept the[ ] assumption that the Legislature was primarily motivated by a desire to provide adequate support for children born out of wedlock. However, the support obligation cannot be enforced without a preliminary determination of paternity." *Id.* at 374. As we concluded: "The act allows fathers to seek and receive such determinations." *Id.* at 375. *"Any other conclusion,"* we held, *"requires an impossibly restrictive and unnecessary interpretation of the statutory language." Id.* (emphasis added).

Judge Hood stated the matter very well, in my view, in his opinion concurring in part and dissenting in part in *In re Paternity of Flynn,* 130 Mich App 740, 765-766; 344 NW2d 352 (1983):[15]

[A]lthough I agree with the majority opinion's

---

[15] For a summary of the rather convoluted facts in *Flynn,* see n 13.

finding that the primary purpose of the Paternity Act is to provide support for illegitimate children, . . . the act certainly cannot be construed to preclude Alan Castle's petition merely because David Flynn does currently provide support to Jessica Flynn and is willing to continue to do so. The act is concerned with determining the *biological* father's duty to support. If Alan Castle declares himself to be that biological father, seeks a court determination of that fact, and is willing to accept support obligations thereto, his petition under the Paternity Act is appropriate.

I frankly do not understand why the Paternity Act's concededly predominant purpose of facilitating support for children born out of wedlock should be thought to militate affirmatively *against* the standing of a putative father in a case like the one before us. The unfortunate fact that, in our society, the act's primary utility lies in compelling unwilling and recalcitrant fathers to meet their support obligations is no reason to deny standing to those fathers who desire to acknowledge their paternal responsibilities. See part II(D).

### D. POLICY CONCERNS

This brings me to the policy concerns implicated by this case. The majority does not address most of these concerns to any significant degree, although they are the concerns upon which the Wagenmakers, and the Attorney General as amicus curiae, primarily rely.[16] The Wagenmakers contend

---

[16] One policy argument which the majority does articulate is that its reading of the Paternity Act "comports with the traditional preference for respecting the presumed legitimacy of a child born during a marriage." *Ante,* p 246. Finding that Girard has standing in this case would not conflict in any way, however, with the *rebuttable* presumption of marital paternity under *Serafin.* What Girard seeks is precisely the opportunity to *rebut* that presumption. Unlike amicus curiae the Family Law Council, I do not understand Girard to be

that it would be profoundly undesirable to permit a putative father legal standing to bring a paternity claim against the wishes of the mother and her husband, where the mother and husband maintain an intact marriage and choose to treat the child as their own. At first glance, there might appear to be substantial force to this argument, which relies not only on the principle of protecting the sanctity of the family, but on the emotional and psychological well-being of the child involved. It must be conceded that a case like this one raises a painful moral dilemma. For several reasons, however, I believe this broad policy argument must fail.

First, and perhaps most important given the precept of judicial restraint, a substantive policy question like this should be left to the Legislature. As I have demonstrated above, the only reasonable reading of the language of the Paternity Act, *as previously interpreted by this Court,* compels the conclusion that the Legislature has authorized a paternity action like that brought by Girard in this case. If, on the other hand, the statutory language does not permit this Court to avoid the moral and policy questions, I would conclude that the balance of interests weighs in favor of permitting Girard's claim. It is more than a little hypocritical to contend, as do the Wagenmakers, that denying standing to Girard is consistent with "the law's repugnance to adulterers." The biological

claiming the right to establish his paternity over the husband's by a mere preponderance of the evidence, rather than under the "clear and convincing" evidentiary burden established by *Serafin.*

Given the high degree of certainty permitted by modern-day paternity testing procedures, such subtle distinctions between burdens of proof are moot in any event. See Mark D. Kolins, M.D., *The role of paternity testing in cases of disputed parentage,* 63 Mich B J 1169 (1984) (human leukocyte antigen [HLA] test capable of *disproving* paternity with certainty and of *proving* paternity with up to 99.9 percent accuracy).

mother in this kind of situation is certainly no less an "adulterer" than the biological father. It is surely a bit late to talk of preserving the "sanctity" of the marital family by the time a situation like the one alleged in this case has arisen.

There is still a more basic pragmatic issue. Denying putative fathers like Girard a *legal* forum in which to press their claims will not prevent such claims from being made, quite possibly at times and in a manner far less conducive to the psychological health and security of the child involved. The law, after all, cannot sweep reality under the rug. Instead of leaving such paternity disputes unresolved, to fester and rankle down through the years, would it not be more desirable to give the parties their day in court and settle the issue once and for all? If the concern is the possibility of malicious or unfounded lawsuits, appropriate sanctions already exist. Furthermore, the Wagenmakers' concern that the mechanics of the paternity inquiry would intrude unacceptably into their intimate marital privacy is unfounded given the ease and reliability of modern scientific paternity testing on the basis of blood samples. See Mark D. Kolins, M.D., *The role of paternity testing in cases of disputed parentage,* 63 Mich B J 1169 (1984).

The Wagenmakers seek to distinguish prior cases which have upheld a putative father's standing to claim paternity of the child of a married woman by noting that in all such cases, unlike this one, the marriage involved had ended or divorce proceedings had begun. See, e.g., *Perry v Stewart,* 177 Mich App 460; 442 NW2d 677 (1989); *Smith, supra.* I would certainly agree that the continuing existence of an intact marriage would likely be a crucial factor weighing in favor of the mother with regard to any support, custody, or visitation dis-

pute arising in a case like this one. But such factors are not properly considered at the stage of litigation which we address in this case. This, I believe, is the crux of the flaw in the Wagenmakers' policy arguments. There is no question that in any dispute concerning the biological father's right to develop or maintain any actual relationship with his child—once it is established that he *is* the biological father—the ultimate governing standard would be "the best interests of the child." See MCL 722.25; MSA 25.312(5). But this governing factor can best be considered individually in the very hearing the putative father seeks following the threshold determination of paternity.

It cannot be emphasized too strongly that upholding Girard's standing to bring his paternity claim would not *in any way* endorse or prejudge his claim to provide support for the child, or his claim to custody or visitation rights. But to deny Girard *standing* to bring his claim at the very outset is inherently unjust. The fact that it might appear unlikely or improbable that a given putative father might ultimately succeed on the merits of his claim in no way justifies denying him his day in court to *make* that claim. I am unwilling to make the arbitrary assumption that *no* support, custody, or visitation claim by a putative father, regarding the child of a married woman, will *ever* have sufficient merit to justify recognizing the standing of *any* such claimants. The merits of each case are most appropriately considered at the very court hearing which the putative father seeks. His minimal right to such a hearing—in elemental due process terms, "the opportunity to be heard 'at a meaningful time and in a meaningful manner' "[17] —is the *only* issue before this Court in this case.

[17] *Mathews v Eldridge*, 424 US 319, 333; 96 S Ct 893; 47 L Ed 2d 18 (1976).

The Attorney General argues that the sole permissible purpose of a paternity claim under the Paternity Act is to obtain support for the child, and that where the mother does not desire to receive support from a putative father such as Girard, and where no objective and demonstrable need for such support exists, the putative father should be held to lack standing. This is similar to the legislative purpose argument put forth by the majority, which I have discussed in parts II(B) and (C). Indeed, the majority appears to endorse the Attorney General's illogically narrow view of the purpose of the statutory grant of standing to putative fathers.[18] This legislative purpose argument is also, essentially, the argument this Court rejected in *Syrkowski*.[19] See part II(C). It is difficult to reconcile the argument with the fact that MCL 722.714(6); MSA 25.494(6) categorically grants standing to putative fathers to bring paternity claims, and does not predicate that standing upon some demonstrated need or desire for child support on the part of the mother.

---

[18] See n 20.

[19] The Attorney General argues that *Syrkowski* somehow fits within his narrow conception of a permissible support action under the Paternity Act, but this cannot be plausibly maintained. The mother in *Syrkowski* had no need to seek child support from the biological father in that case because the mother did not even have—or claim any interest in having—custody of the child. *Syrkowski* involved a collusive, coöperative arrangement in which the mother had already voluntarily relinquished custody to the biological father and his wife, pursuant to a "surrogate mother" agreement. Thus, the father was already supporting the child voluntarily, without any need for legal action. While the Attorney General rejects the notion that the Paternity Act could properly be used for the "sole purpose" of legally determining the putative father's paternity, that is, in effect, precisely what this Court approved in *Syrkowski.* Were it not for their desire to secure a legal determination of paternity, as such, the parties in *Syrkowski* would never have commenced their collusive lawsuit in the first place. *Syrkowski* is indisputably just as remote—if not more so—from the Attorney General's conception of a permissible support action as is the instant case.

Indeed, it seems obvious that in some cases, regardless of whether the mother is married or unmarried, she may not want to have anything more to do with the biological father and may affirmatively resist any effort by him to claim paternity or provide support. It is equally apparent that the primary utility of MCL 722.714(6); MSA 25.494(6) and its ancestor provisions has been to permit the biological father to *independently* assert and preserve his own interest in, and relationship to, the child. It is difficult to imagine what other purpose the provision could conceivably serve.[20] If the *exclusive* purpose of the law

[20] The majority appears to adopt the Attorney General's argument that the sole purpose of MCL 722.714(6); MSA 25.494(6), traced back to its ancestor provision, 1941 PA 316, § 12, is to enable the father to beat the mother to the courthouse by filing his claim first, thereby avoiding the embarrassments and legal complications of being a defendant to the mother's claim. Before 1986, such embarrassments and complications included possible issuance of a warrant for the father's arrest. Such quasi-criminal aspects of the Paternity Act were eliminated by 1986 PA 107, however, and the statute now provides for issuing a summons "in the same manner as . . . in civil actions." MCL 722.714(5); MSA 25.494(5). The rationale proposed by the majority and the Attorney General makes no sense in any event. If a father wants to avoid being named a defendant in a paternity claim brought by the mother, and thereby, under the archaic version of the statute, "forestall a warrant upon the action of the mother," *ante*, p 249, he does not need to file any preëmptive claim of his own. He can simply acknowledge his paternity and provide support voluntarily, obviating the need for any contested legal action at all.

The majority reads far too much into the text of the archaic 1941 enactment. The majority would convert a logically necessary and unremarkable *consequence* of the father's filing of his claim—that it "shall be a bar to the issuance of a warrant or prosecution thereof," 1941 PA 316, § 12—into the underlying *goal* of the father's claim. But if the mother herself asserts the father's paternity and seeks support from him, the father, under the very terms of the 1941 enactment, can forestall the mother's complaint by acknowledging his paternity and agreeing voluntarily to an "order or arrangement for the support of [the] child," *id.* The 1941 enactment made the *failure* of the mother to seek paternal support an actual *prerequisite* to the father's standing, by *barring* his claim where an order at the mother's instigation "has [already] been made or proceedings instituted therefor," *id.* The

were to assist the mother in obtaining support from a recalcitrant father, that would already be fully served by the law's grant of standing to the mother and the DSS.[21]

Taking the broadest view of the statutory scheme, it seems to me that there would be something oddly askew with a legal framework which recognized the standing of a husband seeking to *dis*claim paternity of his wife's child, yet refused standing to a man seeking to *claim* paternity of such a child.[22] There is a sadly negative cast to the

present version of the statute, of course, places no restrictions or limitations whatsoever on a good-faith complaint by a "putative father of a child born out of wedlock" seeking "an order of filiation declaring paternity and providing for the support of the child." See MCL 722.714(6); MSA 25.494(6), MCL 722.717(1); MSA 25.497(1). Under either the archaic or the modern version of the statute, by the simple process of logical elimination, the father's independent standing becomes most useful and important *precisely* in those cases where he truly *wants* to claim paternity and provide support but where the mother, for whatever reason, denies his paternity and wants to have nothing to do with him.

[21] The Attorney General suggests that when a putative father brings a paternity claim regarding a child born to a married woman, the circuit court should *first,* as a prerequisite to finding that the claimant has standing to litigate the issue of paternity itself, "make a preliminary determination of whether there is a true issue of support of the child." This puts the cart before the horse, however, and would be cumbersome and unworkable in practice. The issue of paternity is capable of far simpler and more expeditious resolution than the issue of financial support needs. It would be unthinkable to subject the mother and her husband to the inconvenience of litigating the latter issue before it has even been determined that the claimant is indeed the natural father. Furthermore, the natural father's interest, even in providing support, is presumably not limited to simply meeting the child's objective material needs, but would include establishing a meaningful emotional relationship, whether through support, visitation, actual custody, or some combination of the three. The natural father's potential interest in such a relationship, whatever weight it may be entitled to in light of the child's best interests, bears little or no relationship to whether the child's objective material needs are already being adequately met by the mother and her husband.

[22] Such a statutory scheme could hardly be said to protect children in any consistent manner from "the stigma of illegitimacy," a goal often cited in support of such statutes. Compare *Michael H v Gerald D,* 491 US 110, 119-120; 109 S Ct 2333; 105 L Ed 2d 91 (1989) (opinion of Scalia, J.) with *id.,* pp 161-162 and n 4 (White, J., dissenting).

entire law of paternity. The focus is almost always on the recalcitrant father, forced unwillingly into supporting a child he refuses to acknowledge. It is rarely on the out-of-wedlock father who willingly shoulders his paternal responsibilities and voluntarily seeks to establish a relationship with his child. This undertow of social assumptions has even affected the constitutional case law of the United States Supreme Court, which has shown solicitous concern for the due process rights of the unwilling father threatened with involuntary liability for child support,[23] while turning a remarkably cold shoulder to the due process claims of willing fathers who wish to maintain a relationship with their children.[24] This Court, however, need not and should not interpret Michigan's Paternity Act in such a selective and negative manner.[25]

### III. CONSTITUTIONAL CONCERNS

Even if the majority's interpretation of the Paternity Act were otherwise plausible, a final con-

[23] See, e.g., *Little v Streater,* 452 US 1; 101 S Ct 2202; 68 L Ed 2d 627 (1981).

[24] See *Michael H v Gerald D,* n 22 *supra; Lehr v Robertson,* 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983); see also part III.

[25] In view of my conclusions with regard to the Paternity Act, I need not discuss the Child Custody Act at any length. I agree with the majority that paternity actions should generally be brought under, and governed by, the Paternity Act. I also agree that *if* the majority were correct in its construction of the Paternity Act, Girard would not qualify as a "parent" under the Child Custody Act. I note, however, that *Ruppel v Lesner,* 421 Mich 559; 364 NW2d 665 (1984), on which the majority relies, does not *by itself* have any bearing whatsoever on the issues raised in this case, because there was simply no dispute in *Ruppel* as to the identity of the "parents."

Given my construction of the Paternity Act, I would conclude that a man who has been properly adjudicated to be the natural father of a child under that statute qualifies as a "parent" under the Child Custody Act, and may as such litigate custody and visitation thereunder. Again, as I have already noted, it cannot be emphasized too

sideration would nevertheless incline me to read the law so as to grant Girard the day in court that he seeks. The majority's resolution of this case may have the effect of foreclosing any possibility for Girard to develop a legally sanctioned relationship with his putative child, despite the fact, as we must assume in the case's present posture, that he is every bit as much her natural parent as Judy Wagenmaker. His potential relationship with his child is thus destroyed without his ever having been afforded the opportunity to present his case on the merits in a fair, individualized hearing.

The Michigan Constitution guarantees every individual the right not to "be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. A father's interest in establishing and maintaining a relationship with his child unquestionably falls within the scope of that "liberty" of which a person may not be deprived without due process. The United States Supreme Court, applying the Due Process Clause of the Fourteenth Amendment, US Const, Am XIV, § 1, has rendered two deeply divided rulings during the past decade concerning the rights of a putative father to establish or maintain a relationship with his child. See *Michael H v Gerald D,* 491 US 110; 109 S Ct 2333; 105 L Ed 2d 91 (1989); *Lehr v Robertson,* 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983).[26] In each of those cases, the majority rejected the putative father's due process claim,

---

strongly that nothing in this conclusion suggests or prejudges what the outcome of any such custody or visitation claim would or should be on the merits. That would be governed by "the best interests of the child." MCL 722.25; MSA 25.312(5).

[26] But see *Stanley v Illinois,* 405 US 645; 92 S Ct 1208; 31 L Ed 2d 551 (1972), and *Caban v Mohammed,* 441 US 380; 99 S Ct 1760; 60 L Ed 2d 297 (1979).

and it appears reasonably likely that Michigan law, as interpreted by the majority in this case, would likewise pass muster under the federal Due Process Clause as currently interpreted. For purposes of interpreting Michigan's own Due Process Clause, however, I find far more persuasive the reasoning expressed in Justice White's dissenting opinion in *Lehr,* see 463 US 268-276, and in Justice Brennan's and Justice White's dissenting opinions in *Michael H,* see 491 US 136-157, 157-163. I would adopt that reasoning in interpreting Michigan's Due Process Clause.

Applying the analysis of the *Lehr* and *Michael H* dissents, the validity of the Paternity Act under the Michigan Constitution is thrown into grave doubt by the majority's statutory interpretation in this case. In accordance with our duty to interpret the laws of this state, wherever possible, so as to conform to constitutional requirements, see *People v Neumayer,* 405 Mich 341, 362; 275 NW2d 230 (1979); *People v Bricker,* 389 Mich 524, 528; 208 NW2d 172 (1973), I would interpret the Paternity Act so as to afford Girard the standing he seeks.[27]

IV. CONCLUSION

For the foregoing reasons, I dissent and would affirm the judgment of the Court of Appeals.

_____

[27] The majority correctly notes that the constitutional validity *as such* of the Paternity Act, under either the United States or Michigan Constitution, is outside the scope of this appeal and, therefore, not decided in this case. See *ante,* p 234, n 3. The correct interpretation of the Paternity Act *as a statute* is most assuredly within the scope of this appeal, however, and in construing that statute we are obliged to follow that basic rule of statutory construction, cited above, which requires us to interpret statutes in a manner avoiding potential constitutional problems. It is in that regard that I raise the constitutional concerns discussed above. These concerns cannot be brushed aside as easily as the majority suggests.

LEVIN, J., concurred with CAVANAGH, C.J.

MALLETT, J., took no part in the decision of this case.